IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED
2006 OCT -3 P 2:42
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

UNITED STATES OF AMERICA )
)
V. ) CASE NO:3:05-CR-121-LSC
)
MALIK ELAWAD )

## NOTICE OF EXHIBITS

The defendant, Malik Elawad, and gives notice of the filing of the following in support of his sentencing position:

## TABLE OF EXHIBITS

| Exhibit Number | Exhibit Name |
|---|---|
| 1. | Plea Agreement filed on February 6, 2006 |
| 2. | Photograph of Dr. & Mrs Salaman & Maimoona Elawad |
| 3. | Wikipedia Internet Encyclopedia Article re: Omar Hassan Ahmad al-Bashir |
| 4. | Wikipedia Internet Encyclopedia Article re: Sharia |
| 5. | Photograph of Soccer Trophies received by Mr. Elawad Between 1992 and 1995 |
| 6. | Photograph of Marcus Point Baptist Church and Woodham High School Basketball Trophies from 1999 to 2001 |
| 7. | Workman Middle School Certificate for Excellence in Keyboarding, awarded on May 21, 1998 |
| 8. | Booker T. Washington High School National Beta Club Certificate, |

awarded in May of 2000

9. Secretary of Navy Scholastic Leadership Award

10. Wm J. Woodham High School Grades Transcript

11. Photograph of "Sports Medicine Student of the Year" Award and Science and Math Club Trophy

12. Health Occupations Students of America Certificate Awarded on December 18, 2002

13. Central High School Advanced Technical Diploma, awarded on May 23, 2003

14. Chattahoochee Valley Community College Grade Transcript

15. Pre-sentence Report prepared on March 15, 2006

16. Character Letters Written in Support of Mr. Elawad, dated May 9 and 10 of 2005

17. Malawi Update, Issue No 13 dated April 1995

18. Psychological Evaluation, dated October 28, 2005 (under seal)

19. Ledger-Enquirer Newspaper Article entitled, "Family apologizes to wounded officer, asks son to surrender," dated May 5, 2005.

20. Photograph of Mr. Elawad at age six (6) Months

21. Photograph of a very young Mr. Elawad with his brother and friends in Africa

22. Photograph of Mr. Elawad at approximately age seven (7)

23. Photograph of Mr. Elawad at approximately aged ten (10). He is pictured with the soccer team he played with at the time.

24. Photograph of Mr. Elawad at age fourteen (14). He is pictured with

team mates from the Marcus Point Baptist Church Basketball league.

25.        Photograph of Mr. Elawad with his brothers, Aymen, Hassan, Gamal, and Rayyan.

26.        Central High School Graduation Photograph of Mr. Elawad, age eighteen (18).

27.        Photograph of Mr. Elawad at age 18

Respectfully submitted,

**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Defendant
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: Christine_Freeman@fd.org

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **CASE NO:3:05-CR-121-LSC** |
| | ) | |
| **MALIK ELAWAD** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 3rd day of October 2006, served a copy of the foregoing **EXHIBITS IN SUPPORT OF SENTENCING POSITION** upon the following, by **HAND DELIVERING** a copy of the same to the following addresses:

Todd Brown, Esquire
Assistant U.S. Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Defendant
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL: (334) 834-2099
FAX: (334) 834-0353

# TABLE OF EXHIBITS

| Exhibit Number | Exhibit Name |
|---|---|
| 1. | Plea Agreement filed on February 6, 2006 |
| 2. | Photograph of Dr. & Mrs Salaman & Maimoona Elawad |
| 3. | Wikipedia Internet Encyclopedia Article re: Omar Hassan Ahmad al-Bashir |
| 4. | Wikipedia Internet Encyclopedia Article re: Sharia |
| 5. | Photograph of Soccer Trophies received by Mr. Elawad Between 1992 and 1995 |
| 6. | Photograph of Marcus Point Baptist Church and Woodham High School Basketball Trophies from 1999 to 2001 |
| 7. | Workman Middle School Certificate for Excellence in Keyboarding, awarded on May 21, 1998 |
| 8. | Booker T. Washington High School National Beta Club Certificate, awarded in May of 2000 |
| 9. | Secretary of Navy Scholastic Leadership Award |
| 10. | Wm J. Woodham High School Grades Transcript |
| 11. | Photograph of "Sports Medicine Student of the Year" Award and Science and Math Club Trophy |
| 12. | Health Occupations Students of America Certificate Awarded on December 18, 2002 |
| 13. | Central High School Advanced Technical Diploma, awarded on May 23, 2003 |
| 14. | Chattahoochee Valley Community College Grade Transcript |
| 15. | Pre-sentence Report prepared on March 15, 2006 |
| 16. | Character Letters Written in Support of Mr. Elawad, dated May 9 and 10 of 2005 |

17. Malawi Update, Issue No 13 dated April 1995

18. Psychological Evaluation, dated October 28, 2005 (under seal)

19. Ledger-Enquirer Newspaper Article entitled, "Family apologizes to wounded officer, asks son to surrender," dated May 5, 2005.

20. Photograph of Mr. Elawad at age six (6) Months

21. Photograph of a very young Mr. Elawad with his brother and friends in Africa

22. Photograph of Mr. Elawad at approximately age seven (7)

23. Photograph of Mr. Elawad at approximately aged ten (10). He is pictured with the soccer team he played with at the time.

24. Photograph of Mr. Elawad at age fourteen (14). He is pictured with team mates from the Marcus Point Baptist Church Basketball league.

25. Photograph of Mr. Elawad with his brothers, Aymen, Hassan, Gamal, and Rayyan.

26. Central High School Graduation Photograph of Mr. Elawad, age eighteen (18).

27. Photograph of Mr. Elawad at age 18

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO. 03:05-CR-0121-F** |
| | ) | |
| **MALIK ELAWAD** | ) | |

# PLEA AGREEMENT

**DEFENSE COUNSEL:** **CHRISTINE A. FREEMAN**

**ASSISTANT U.S. ATTORNEY:** **TODD A. BROWN**

## COUNT AND STATUTES CHARGED:

Count 1 18 U.S.C. § 2113(a), (d)
Bank Robbery

Count 2 18 U.S.C. § 924(c)(1)(A)(iii)
Discharge of Firearm in During Crime of Violence

## COUNT(S) PLEADING PURSUANT TO PLEA AGREEMENT:

Count 1 18 U.S.C. § 2113(a), (d)
Bank Robbery

Count 2 18 U.S.C. § 924(c)(1)(A)(iii)
Discharge of Firearm in During Crime of Violence

## PENALTIES BY COUNT - MAXIMUM PENALTY:

Count 1 18 U.S.C. § 2113(a), (d)
Bank Robbery

A term of imprisonment which may not be more than 25 years, a fine not to exceed $250,000, or both fine and imprisonment; a term of supervised release of no more than 5 years; and an assessment fee of $100.00.

Count 2 18 U.S.C. § 924(c)(1)(A)(iii)

DEFENDANT'S
EXHIBIT
1

Discharge of Firearm in During Crime of Violence

A term of imprisonment which may not be less than 10 years, not more than life, consecutive to the crime of violence, a fine not to exceed $250,000, or both fine and imprisonment; a term of supervised release of no more than 5 years; and an assessment fee of $100.00.

**ELEMENTS OF THE OFFENSE(S):**

Count 1 18 U.S.C. § 2113(a), (d)
Bank Robbery

1. The defendant knowingly took from the person or the presence of the person described in the indictment, money or property then in the possession of a federally insured bank, as charged; and,

2. The defendant did so by means of force and violence or by means of intimidation.

Count 2 18 U.S.C. § 924(c)(1)(A)(iii)
Discharge of Firearm in During Crime of Violence

1. The defendant committed a crime of violence, as charged;

2. That during and in relation to the commission of that offense the defendant discharged a firearm; and,

3. The defendant did so knowingly.

******************************************************************************

Todd A. Brown, Assistant United States Attorney, and Christine A. Freeman, Federal Defender, attorney for the defendant, pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Indictment herein and a Plea Agreement has been reached by said parties.

**GOVERNMENT'S PROVISIONS**

1. Upon entering a plea of guilty by the defendant to the offense charged in Counts 1 and 2 of the Indictment, the attorney for the Government will do the following:

a. The Government will agree that a 2-level reduction in the applicable offense level pursuant to U.S.S.G. § 3E1.1(a) for the defendant's acceptance of responsibility is appropriate, so long as the defendant does not obstruct justice or otherwise fail to accept responsibility for the offense conduct. Should the Government find the defendant assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and this Court to allocate their resources efficiently, and if Defendant otherwise qualifies, the Government will move at sentencing for a further reduction of one level, pursuant to U.S.S.G. § 3E1.1(b). Determination of whether the defendant met the defendant's obligations to qualify for the reduction pursuant to U.S.S.G. § 3E1.1 is at the sole discretion of the United States.

b. That the defendant is entitled to a minor role reduction of 2 levels, pursuant to U.S.S.G. § 3B1.2(b).

c. The Government agrees that no enhancement pursuant to U.S.S.G. § 2B3.1(b)(2)(A) is applicable in this case, because the defendant is being sentenced for discharging of a firearm, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii).

d. The Government agrees to a sentence at the low end of the applicable guideline range. This agreement includes the minimum sentence pursuant to 18 U.S.C. § 924(c)(1)(A)(iii), i.e., 10 years.

e. The Government agrees, to the extent that this Court has the authority, to

recommend that the federal sentence in this matter run concurrently with any sentence imposed by the State of Georgia for offenses related to the defendant's conduct in the instant matter.

f. The Government agrees that no cross-referencing provision under U.S.S.G. § 1B1.5 applies in this matter.

2. The United States reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background.

**DEFENDANT'S PROVISIONS**

3. The defendant agrees to the following:

a. To plead guilty to Counts 1 and 2 of the Indictment.

b. Not to commit any other federal, state, or local offense while awaiting sentencing, whether that offense is charged or chargeable or not. Such criminal activity would include, but is not limited to, witness tampering, or facilitation of any other criminal activity. Determination of whether Defendant's conduct is a violation of this provision is at the complete discretion of the Government.

c. The defendant agrees that the amount of loss for which he is criminally liable, and for which he should be sentenced is greater than $10,000. Therefore, a 1 level increase pursuant to U.S.S.G. § 2B3.1(b)(7)(B) is applicable.

d. The defendant agrees that a 2 level increase pursuant to § 2B3.1(b)(1) is applicable because the property taken was the property of a financial institution.

e. The defendant agrees that a law enforcement officer sustained serious bodily injury as a result of the defendant and his accomplice's escape from the bank robbery in this case. Thus, a 4 level increase pursuant to § 2B3.1(b)(3)(B) is applicable. The defendant and the Government agree that the accomplice in this matter actually shot a police officer and that the defendant did not

Case 3:05-cr-00121-LSC-DRB Document 23 Filed 02/06/2006 Page 5 of 11

fire any shot at any law enforcement officer. This fact is taken into consideration in the Government's agreement that the defendant is entitled to a minor role reduction, as set forth in paragraph 1(b) of this agreement.

f. The defendant understands that while the United States Sentencing Guidelines are advisory, the defendant agrees to be sentenced in accordance with the United States Sentencing Guidelines.

g. The facts used to determine the defendant's Guidelines offense level and sentence will be found by the Court at sentencing by a preponderance of the evidence and that the Court may consider any reliable evidence, including hearsay.

**FACTUAL BASIS**

4. The defendant admits the allegations charged in Counts 1 and 2, and understands that the nature of the charge to which the plea is offered involves proof as to Counts 1 and 2, that on or about May 2, 2005, in Russell County, Alabama, the defendant, and Morgan Chigawa, by force, violence, and intimidation, took from the person and presence of another, approximately $10,848, belonging to and in the care, custody, control, management, and possession of Regions Bank, located at 3548 Highway 280/431 North, Phenix City, Alabama, a bank whose deposits were then insured by the Federal Deposit Insurance Corporation, and in committing said offense, Morgan Chigawa assaulted and put in jeopardy the life of another person by the use of a dangerous weapon, by discharging a firearm, during in relation to a crime of violence, the bank robbery, all in violation of Title 18, United States Code, Sections 2113(a)(d), 924(c)(1)(A)(iii), and 2.

**DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK**

5. Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights conferred by 18 U.S.C.

§ 3742 to appeal the sentence. Defendant specifically waives the right to appeal the sentence on the grounds that the sentencing guidelines are in any respect unconstitutional, or that any fact found by the Court for sentencing was not alleged in the Indictment, admitted by the Defendant, found by a jury, or found beyond a reasonable doubt. Defendant further expressly waives the right to appeal the conviction and sentence on any other ground and waives the right to attack the sentence in any post-conviction proceeding. This waiver does not include the right to appeal on the grounds of ineffective assistance of counsel and prosecutorial misconduct.

Notwithstanding the above, the defendant reserves the right to file a direct appeal of an upward departure from the applicable Guidelines range which the sentencing court specifies at the time of sentencing as having been imposed pursuant to either U.S.S.G. § 4A1.3 (from criminal history category) or § 5K2.O (from offense level). The defendant understands and agrees that this waiver as to all other Guidelines findings would still be in force and effect notwithstanding the appealability of an upward departure. Defendant knowingly and voluntarily waives any rights defendant has under federal law to a jury determination of any fact affecting Defendant's sentence.

In return for the above waiver by the defendant, the Government does not waive its right to appeal the sentence imposed in the instant case. The Government does not waive its right to appeal any order dismissing the Indictment, vacating a sentence, or otherwise terminating the prosecution at any stage of the proceedings. Further, the parties agree that nothing in this agreement shall affect the Government's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b). However, if the United States appeals the defendant's sentence pursuant to 18 U.S.C. § 3742(b), the defendant is released from this waiver as to any issue the defendant may raise pursuant to 18 U.S.C. § 3742(a).

**DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT**

6. The defendant, before entering a plea of guilty to Counts 1 and 2, as provided for herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

b. The defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing and that, if a fine is imposed by the Court at sentencing, the defendant shall meet with a member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense. The defendant will make an honest, good faith effort to pay said fine as directed by the Financial Litigation Section of the United States Attorney's Office. The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief.

c. The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

d. The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the

defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

e. The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

f. The Defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

g. The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

h. The defendant further understands that the Government can only make a recommendation, which is not binding upon the Court. However, if the Court does not accept the plea agreement, the Defendant would be permitted to withdraw the defendant's plea, if the defendant so chooses.

i. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant.

However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

j. The defendant understands that there is no possibility of a sentence of probation.

k. The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

7. The undersigned attorneys for the Government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

8. The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The offense level or criminal history category, as calculated by the Probation Officer and determined by the court, may differ from that projected by defendant's counsel or the U.S. Attorney.

This 3rd day of February, 2006.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Todd A. Brown
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101
(334)223-7280

Louis V. Franklin, Sr.
Chief, Criminal Division

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.

Malik Elawad
Defendant

2/6/06
Date

Christine A. Freeman
Attorney for the Defendant

2/6/06
Date

Pictured from Left to Right:
Top: Hassan, Mrs. Maimoona Elawad. Dr. Elawad (holding Rayyan)
Bottom: 2 unidentified children. Malik and Gamal



# Omar Hasan Ahmad al-Bashir

From Wikipedia, the free encyclopedia

Field Marshal **Omar Hasan Ahmad al-Bashir** (Arabic: عمر حسن احمد البشير ; born 1 January 1944) is the President of the Sudan.

Born in the small village of Hosh Bonnaga in 1944, al-Bashir joined the Sudanese Army at a young age and studied at a military academy in Cairo. He quickly rose through the ranks and became a paratrooper. Later, al-Bashir served with the Egyptian Army when it went to war with Israel in 1973. When he returned to the Sudan, al-Bashir was put in charge of military operations against the Sudan People's Liberation Army in the southern half of the country. Becoming a general by the 1980s, al-Bashir took charge of a military coup in 1989 that overthrew democratically elected Prime Minister Sadeq al-Mahdi. Al-Bashir immediately banned all political parties, cracked down on the press, and dissolved Parliament upon assuming control of the nation. He then became Chairman of the Revolutionary Command Council for National Salvation (a newly established body with legislative and executive powers over the country), and assumed the posts of chief of state, prime minister, chief of the armed forces, and minister of defense.

Al-Bashir subsequently allied himself with Hassan al-Turabi, leader of the National Islamic Front, and began a program to make northern Sudan a fundamentalist Islamic state. To this end, al-Bashir imposed Sharia and a harsh new Criminal Act over northern Sudan in 1991, which were enforced by Muslim judges and a newly created Public Order Police. On October 16, 1993, al-Bashir became even more powerful when he was appointed president of the country, after which time the Revolutionary Command Council for National Salvation was dissolved. The executive and legislative powers of the council were subsequently given to al-Bashir, who virtually ruled the nation as a dictator from that point on. He was later "elected" president (with a five year term) in a showcase national election in 1996. In 1998, al-Bashir and the Presidential Committee put into effect a new constitution. In 1999, al-Bashir and the Parliament made a law which allowed limited political "associations" in opposition to al-Bashir and his supporters to be formed, although these groups have failed to gain any significant access to governmental power.

In 1999, al-Bashir consolidated his hold over the country when he removed the biggest threat to his power, al-Turabi, then serving as Speaker of the National Assembly (formed in 1996). Al-Turabi had wanted to give the National Assembly power to remove the president (al-Bashir) from office if it deemed necessary and bring back the post of prime minister, both ideas which appalled al-Bashir. In December of 1999, Al-Bashir declared a state of national emergency, suspended the constitution, disbanded the National Assembly, and stripped al-Turabi of his governmental and party posts (al-Turabi was later arrested and put into custody in 2001). Al-Bashir subsequently purged his cabinet of al-Turabi loyalists in 2000 and replaced them with his own followers. In the same year, new presidential and parliamentary elections were held. Most Sudanese did not vote, and almost all political groups in opposition to al-Bashir boycotted the elections, claiming that they would not be held fairly and that al-Bashir would simply fix the results in his favor if he lost. Most people in the south were not able to participate either, as a result of being controlled by the Sudan People's Liberation Army. Ultimately, al-Bashir won the election by an overwhelming margin and the Parliament became stacked with members of his National Congress Party. Al-Bashir continues to rule Sudan with an iron fist, his power great as a result of the national emergency laws he established in 1999 still being in place. Al-Bashir's second term as president is only supposed to last five years, after which time the law presently forbids him to run again.

DEFENDANT'S EXHIBIT 3

## Al-Bashir on the International Scale

Al-Bashir is a controversial figure in the international arena. He has long



Field Marshal Omar al-Bashir

been accused of harboring and aiding terrorists and Islamic extremists. Osama bin Laden lived and operated in Sudan for five years until he was removed and banned from the country in May 1996. The government of Sudan claims that Al-Bashir had offered the United States the arrest and extradition of Bin Laden and detailed intelligence data earlier that year and that the Clinton administration was not receptive to the idea, though United States officials deny that any such offer was ever made. In 1998, the U.S. bombed a factory in Sudan that was allegedly producing chemical weapons for bin Laden, but many doubt if the factory truly was making such devices at the time of the attack. Sudan was subsequently one of the seven nations put on the U.S. State Department's list of countries that sponsor international terrorism, but al-Bashir has fiercely denied that Sudan aids or has any connections with terrorist groups. Al-Bashir subsequently spoke out against the September 11, 2001 terrorist attacks and pressured Saddam Hussein to let weapons inspectors back into Iraq in 2002. Despite al-Bashir's efforts, Sudan still remains carefully monitored in regard to terrorist activity within its borders. As recently as April 2004, President George W. Bush has called for al-Bashir to step up his efforts in combating terrorism.

Sudan is perhaps best known internationally for the civil war that raged between the northern and southern halves of the country for over 19 years. Throughout his rule, al-Bashir escalated the conflict by launching military attacks against the region. The troops launching these attacks were accused of a multitude of human rights violations, including torture, rape, and the murder of women and children. The civil war also resulted in millions of southerners being displaced, starved, and deprived of education and health care. Because of these actions, various international sanctions were placed on the Sudan. Nevertheless, al-Bashir continued waging war against the south, buying arms and funding military operations with money gained from the sales of the country's vast amount of oil. International pressure intensified in 2001, however, and leaders from the United Nations called for al-Bashir to make efforts to end the conflict and allow humanitarian and international workers to deliver relief to the southern regions of Sudan. Al-Bashir finally caved under the pressure, and peace talks between the northern and southern leaders of the country began in earnest in 2002. Much progress was made throughout 2003, and in early 2004 al-Bashir finally agreed to grant autonomy to the south for six years, split the country's oil revenues with the southern provinces, and allow the southerners to vote in a referendum of independence at the end of the six year period. Some say al-Bashir is reluctant to completely fulfill all of these promises. Al-Bashir has also made statements discouraging southerners to support independence.

As the conflict in the south of Sudan began to die down, a new one started in the western province of Darfur in early 2003. When rebels in the region arose in opposition to the government, al-Bashir gave governmental support and money to Islamic militias, the Janjaweed, combating the rebels (which al-Bashir officially denies) instead of sending the military to intervene. These militias have been accused of ethnic cleansing, and many thousands of people in Darfur have died and been displaced so far as a result of the violence in the region. The United States Government determined in September 2004 "that genocide has been committed in Darfur and that the Government of Sudan and the Jingaweit bear responsibility and that genocide may still be occurring". Al-Bashir declared that the government had quashed the rebellion in February 2004, but rebels still operate within the region and the death toll continues to rise. President George W. Bush and Kofi Annan have recently called for al-Bashir to better cooperate with humanitarian and international organizations by making it easier for them to enter Darfur, but al-Bashir has been for the most part reluctant to allow large numbers of outsiders into the region. Bush has gone so far as to say that international troops would be sent into Darfur to intervene in the conflict if al-Bashir did not let humanitarian aid enter the region. The conflict continues despite a recent ceasefire agreement, and al-Bashir has to date made few real steps to effectively end the crisis. On June 29, 2004, U.S. Secretary of State Colin Powell met with al-Bashir in Sudan and urged him to make peace with the rebels, end the crisis, and lift

restrictions on the delivery of humanitarian aid to Darfur. Kofi Annan met with al-Bashir three days later and demanded he disarm the Janjaweed.

In 2006, Parade magazine's David Wallechinsky ranked al-Bashir #1 in its list of the world's ten worst dictators [1] (http://www.parade.com/articles/editions/2006/edition_01-22-2006/Dictators).

# See also

- List of national leaders
- History of Sudan
- Darfur conflict
- Military of Sudan
- Politics of Sudan

Retrieved from "http://en.wikipedia.org/wiki/Omar_Hasan_Ahmad_al-Bashir"

Categories: Articles lacking sources | 1944 births | Presidents of Sudan | Field Marshals | Current national leaders | Leaders by coup | Living people

---

- This page was last modified 16:30, 27 March 2006.
- All text is available under the terms of the GNU Free Documentation License (see **Copyrights** for details).
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc.
- Privacy policy
- About Wikipedia
- Disclaimers

# Sharia

From Wikipedia, the free encyclopedia

**Sharia** (Arabic: شريعة; also **Sharī'ah**, **Shari'a**, **Shariah** or **Syariah**) is the Arabic word for Islamic law. In the Islamic state sharia governs both public and private lives of those living within the state. Sharia governs many aspects of day-to-day life: politics, economics, banking, business law, contract law, and social issues. The term **Sharia** refers to the body of Islamic law. Some accept Sharia as the body of precedent and legal theory before the 19th century, while other scholars view Sharia as a changing body, and include reform Islamic legal theory from the contemporary period. [*citation needed*]

Part of the series on

**Islam**

**History of Islam**

**Beliefs and practices**

Oneness of God
Profession of Faith
Prayer • Fasting
Pilgrimage • Charity

**Major figures**

Muhammad
Ali • Abu Bakr
Companions of Muhammad
Household of Muhammad
Prophets of Islam

**Texts & Laws**

Qur'an • Hadith • **Sharia**
Jurisprudence • Theology
Biographies of Muhammad

**Branches of Islam**

Sunni • Shi'a • Sufi

**Sociopolitical aspects**

Academics • Philosophy
Art • Science
Architecture • Cities
Calendar • Holidays
Women in Islam • Leaders
Politics • Jihad • Liberalism

**See also**

Vocabulary of Islam
Index of articles on Islam

Before the 19th century legal theory was considered the domain of the traditional legal schools of thought. Most Sunni Muslims follow Hanafi, Hanbali, Maliki or Shafii, while most Shia Muslims follow Jaafari (Hallaq 1997, Brown 1996, Aslan 2006).

## Contents

- 1 Divergent Developments after the 19th century
- 2 Etymology
- 3 General
- 4 Sections of Sharia law
- 5 Contemporary Practice of Sharia Law
- 6 Laws and Practices Under Sharia
  - 6.1 Dietary laws
  - 6.2 The role of women under Sharia
  - 6.3 Dress codes
  - 6.4 Domestic punishments
  - 6.5 Circumcision
  - 6.6 Muslim apostates
  - 6.7 Illegal sexual relations: Adultery, Fornication and Homosexuality
  - 6.8 Freedom of Speech
- 7 See also
- 8 References
- 9 External links
  - 9.1 Muslim websites
    - 9.1.1 Sunni websites
    - 9.1.2 Reformist websites

DEFENDANT'S EXHIBIT 4

## Divergent Developments after the 19th century

During the 19th century the history of Islamic law took a sharp turn due to new challenges the Muslim world faced: the West had risen to a global power and colonized a large part of the world, including Muslim territories. Societies underwent transition from the agricultural to the industrial stage. New social and political ideas emerged and social models slowly shifted from hierarchical towards egalitarian. The Ottoman Empire and the rest of the Muslim world were in decline and calls for reform became louder. In Muslim countries, codified state law started

replacing the role of scholarly legal opinion. Western countries sometimes inspired, sometimes pressured, and sometimes forced Muslim states to change their laws. Secularist movements pushed for laws deviating from the opinions of the Islamic legal scholars. Islamic legal scholarship remained the sole authority for guidance in matters of rituals, worship and spirituality, while they lost authority to the state in other areas. The Muslim comunity became divided into groups reacting differently to the change. This division persists until the present day (Brown 1996, Hallaq 2001, Ramadan 2005, Aslan 2006, Safi 2003).

- **Secularists** believe the law of the state should be based on secular principles, not on Islamic legal theory.
- **Traditionalists** believe that the law of the state should be based on the traditional legal schools. However, traditional legal views are considered unacceptable by most modern Muslims, especially in areas like women's rights or slavery [1] (http://www.averroes-foundation.org/articles/sex_slavery.html).
- **Reformers** believe that new Islamic legal theories can produce modernized Islamic law [2] (http://www.averroes-foundation.org/articles/islamic_law_evolving.html) and lead to acceptable opinions in areas such as women's rights [3] (http://www.averroes-foundation.org/articles/free_and_equal.html).
- **Salafis** believe that the traditional schools were wrong, and therefore failed, and strive to follow the generation of early Muslims.

# Etymology

The term Sharia itself derives from the verb *shara'a*, which according to Abdul Mannan Omar's *Dictionary of the Holy Qur'an* connects to the idea of "spiritual law" (5:48) and "system of divine law; way of belief and practice" (45:18) in the Qur'an.

# General

Mainstream Islam distinguishes between *fiqh*, which means 'understanding of details' and refers to the inferences drawn by scholars, and *sharia*, which refers to the principles that lie behind the *fiqh*. Scholars hope that *fiqh* and *sharia* are in harmony in any given case, but they cannot be sure.[citation needed]

Sharia has certain laws which are regarded as divinely ordained, concrete and timeless for all relevant situations (for example, the ban against drinking liquor as an intoxicant). It also has certain laws which are extracted based on principles established by Islamic lawyers and judges (*Mujtahidun*).

For Sunni Muslims, the primary sources of Islamic law are the Qur'an, the Hadith, the unanimity of Muhammad's disciples on a certain issue (*ijma*), and *Qiyas* (drawing analogy from the essence of divine principles). *Qiyas* — various forms of reasoning, including by analogy — are used by the law scholars (*Mujtahidun*) to deal with situations where the sources provided no concrete rules. The consensus of the community or people, public interest, and others were also accepted as secondary sources where the first four primary sources allow. [citation needed]

In Imami-Shi'i law, the sources of law (*usul al-fiqh*) are the Qur'an, anecdotes of the Prophet's practices and those of the 12 Imams, and the intellect (*aql*). The practices called *Sharia* today, however, also have roots in local customs (*Al-urf*).[citation needed]

Islamic jurisprudence is called *fiqh* and is divided into two parts: the study of the sources and methodology (*usul al-fiqh* - roots of the law) and the practical rules (*furu' al-fiqh* — branches of the law).[citation needed]

The comprehensive nature of *Sharia* law is due to the belief that the law must provide all that is necessary for a person's spiritual and physical well-being. All possible actions of a Muslim are divided (in principle) into five categories: obligatory, meritorious, permissible, reprehensible, and forbidden. Fundamental to the obligations of

every Muslim are the Five Pillars of Islam.

# Sections of Sharia law

Sharia law is divided into two main sections:

1. The acts of worship, or al-ibadat, these include:
   1. Ritual Purification (Wudu)
   2. Prayers (Salah)
   3. Fasts (Sawm and Ramadan)
   4. Charities (Zakat)
   5. Pilgrimage to Mecca (Hajj)
2. Human interaction, or al-mu'amalat, which includes:
   1. Financial transactions
   2. Endowments
   3. Laws of inheritance
   4. Marriage, divorce, and child care
   5. Foods and drinks (including ritual slaughtering and hunting)
   6. Penal punishments
   7. Warfare and peace
   8. Judicial matters (including witnesses and forms of evidence)

# Contemporary Practice of Sharia Law

There is tremendous variance in the interpretation and implementation of Islamic law in Muslim societies today. More recently, liberal movements within Islam have questioned the relevance and applicability of *sharia* from a variety of perspectives. As a result, several of the countries with the largest Muslim populations, including Indonesia, Bangladesh and Pakistan, have largely secular constitutions and laws, with only a few Islamic provisions in family law. Turkey has a constitution that is strongly secular.

Most countries of the Middle East and North Africa maintain a dual system of secular courts and religious courts, in which the religious courts mainly regulate marriage and inheritance. Saudi Arabia and Iran maintain religious courts for all aspects of jurisprudence, and religious police assert social compliance. Laws derived from *sharia* are also applied in Sudan, Libya and Afghanistan. Some states in northern Nigeria have reintroduced *Sharia* courts. In practice the new Sharia courts in Nigeria have most often meant the re-introduction of relatively harsh punishments without respecting the much tougher rules of evidence and testimony. The punishments include amputation of one/both hand(s) for theft, stoning for adultery, and execution for apostasy.

Many consider the punishments perscribed by Sharia as being barbaric and cruel; Islamic scholars argue that, if implemented properly, the punishments serve as a deterrent to crime. In international media, practices by countries applying Islamic law have fallen under considerable criticism at times. This is particularly the case when the sentence carried out is seen to greatly tilt away from established standards of international human rights. This is true for the application of the death penalty for the crime of adultery, and other such punishments such as amputations for the crime of theft and flogging for fornication or public intoxication. [4] (http://www.hrw.org/reports/2004/nigeria0904/5.htm)

An unusual secular-state example was the proposal for a Sharia arbitration court to be established in Ontario, Canada. That province's 1991 arbitration court law allows disputes to be settled in alternative courts to avoid congestion and delay in the court system. The court would handle disputes between Muslim complainants. Critics claimed that misogyny which they held to be inherent in Sharia might influence the Canadian justice system, but proponents argued that those who do not wish to go by the court's rulings are not forced to attend it. Moreover,

these sharia courts in Canada are only orthodox in a limited way as they respect the priority of Canadian civil law. Anybody not satisfied with a ruling from the sharia court can appeal to a civil court. As such, this sharia court would be only a very pale version of Sharia.

On September 11, 2005, Ontario premier Dalton McGuinty stated in a telephone interview that religious arbitration would no longer be allowed. However, the proposed changes to the Ontario Arbitration Act[5] (http://www.attorneygeneral.jus.gov.on.ca/english/news/2005/20051115-arbitration-bg.asp) do not specifically mention religious arbitration, but reduce the power of private arbitration in the area of family law, and introduce other changes. Specifically, under the proposed changes family arbitrators will be regulated, participants in family law arbitration cases will not be able to give up their right to appeal an arbitrator's decision to a court, and a pre-nuptial agreement to resolve family law matters, should they arise, through an arbitrator rather than through a court will no longer be binding.

Nevertheless, the proposed changes were condemned by parts of the Muslim and Jewish community, and legal challenges to the new law remain a distinct possibility.

Like Jewish law and Christian canon law, Islamic law is interpreted differently by different people in different times and places.

In the hands of fundamentalists, however, it is legally binding on all people of the faith and even on all people who come under their control. Islamic law to American Muslims in Dearborn, Boston, or Houston is very different than Islamic law to religious Muslims in Egypt, Saudi Arabia, the Gaza Strip, western China, Nigeria[6] (http://news.bbc.co.uk/2/hi/africa/3667515.stm) or Indonesia. All follow Islamic law, yet their view of the law varies as much as individual Muslims vary.[*citation needed*]

# Laws and Practices Under Sharia

## Dietary laws

*Main article: Islamic dietary laws*

When eating meat, *sharia* dictates that Muslims may only eat from meat that has been slaughtered in the name of God and meets stringent dietary requirements. Such meat is called *halāl* or "lawful" (acceptable). Islamic law prohibits a Muslim from eating pork, and meat that has been slaughtered in other than the name of God. Most juridical opinions also hold monkey, dog, cat, carnivores and several other types of animal as being prohibited, or *harām*. For the meat of an animal to be *halāl* it must be one of the declared *halāl* species, it must generally be slaughtered by a Muslim using the correct method, and it may not be killed by excessively cruel or painful means. The traditional means of slaughter is by slicing open the jugular veins at the neck, resulting in quick blood loss; a state of shock and unconsciousness is induced, and death soon follows through cardiac arrest.

According to the Qur'an, the animal does not have to be slaughtered by a Muslim, but may be slaughtered by a Jew or a Christian (People of the Book) as long as it meets their strict dietary laws (*Al-Ma'ida* 5: "The food of those who have received the Scripture is lawful for you.") Thus, most Muslims will accept *kosher* meat as *halāl*. (Qur'an 2:173, 6:121)

## The role of women under Sharia

*Main article: women in Islam*

Islam does not prohibit women from working, but emphasizes the importance of housekeeping and caring for the

families of both parents. In theory, Islamic law allows husbands to divorce their wives at will, by clearly saying talaq ( "I divorce you" ) three times in public. In practice divorce is more involved than this and state proceedings vary. In 2003, for example, a Malaysian court ruled that, under Sharia law, a man may divorce his wife via text messaging as long as the message was clear and unequivocal. [7] (http://news.bbc.co.uk/2/hi/asia-pacific/3100143.stm) Such a divorce, known as the "triple talaq" is not allowed in most Muslim states. Usually, the divorced wife keeps her dowry from when she was married, if there was one, and is given child support until the age of weaning, at which point the child may be returned to its father if it is deemed to be best.

In addition, women are generally not allowed to be clergy or religious scholars. Many interpretations of Islamic law hold that women may not have prominent jobs, and thus are forbidden from working in the government. This has been a mainstream view in many Muslim nations in the last century, despite the example of Muhammad's wife Aisha, who both took part in politics and was a major authority on *hadith*.

A Muslim may not marry or remain married to an unbeliever of either sex (2:221, 60:10). A Muslim man may marry a woman of the People of the Book (5:5); traditionally, however, Islamic law forbids a Muslim woman from marrying a non-Muslim man unless he converts to Islam.

See also *ma malakat aymanukum*.

## Dress codes

The Qur'an also places a dress code upon its followers. For women, it emphasizes modesty. Allah says in the Qur'an, "And tell the believing women to lower their gaze and guard their private parts and not to display their adornment (interpreted as the hair and body-shape) except that which ordinarily appears thereof (interpreted as the face and hands) and to draw their headcovers over their chests and not to display their adornment except to their husbands, their fathers, their husbands fathers, their sons, . . . ." (surat an-Nur verse 31). All those in whose presence a woman is not obliged to practice the dress code are known to be her *mahrams*. Men have a dress code which is more relaxed: the loins must be covered from knee to waist. The rationale given for these rules is that men and women are not to be viewed as sexual objects.

Turkey, a predominantly Muslim country, has laws against these dress codes in schools and work places. After the declaration of the Republic in 1923, as part of revolutions brought by Ataturk, a modern dress code was encouraged. It is against the law to wear a head scarf while attending public school in Turkey, as well as France, where the recently enacted rule caused huge public controversy.

Some view Islamic women as being oppressed by the men in their communities because of the required dress codes. However, in more moderate nations, where these dress codes are not obligatory, there are still many Muslim women who practice it. Whether they choose to wear such clothes of their own free will because they believe it is the will of Allah, or due to community and social pressures is a controversial question.

One of the garments some women wear is the *hijāb* (of which the headscarf is one component). The word *hijab* is derived from the Arabic word *hajaba* which means 'to hide from sight or view', 'to conceal'. *Hijāb* means to cover the head as well as the body.

## Domestic punishments

According to most interpretations, authorization for the husband to physically beat disobedient wives is given in the Qur'an. First, admonishment is verbal, and secondly a period of refraining from intimate relations. Finally, if the husband deems the situation appropriate, he may hit her:

> *"Men are the protectors and maintainers of women, because Allah has given the one more (strength) than the other, and because they support them from their means. Therefore the righteous women are devoutly obedient, and guard in (the husband's) absence what Allah would have them guard. As to those women on whose part ye fear disloyalty and ill-conduct, admonish them (first), (Next), refuse to share their beds, (And last) beat them (lightly); but if they return to obedience, seek not against them Means (of annoyance): For Allah is Most High, great (above you all)."* (Qur'an 4:34 English translation: Yusuf Ali)

The medieval jurist ash-Shafi'i, founder of one of the main schools of *fiqh*, commented on this verse that "hitting is permitted, but not hitting is preferable."

The Arabic verse uses *idribu hunna* (from the root *daraba* ضرب), whose commonest meaning in Arabic has been rendered as "beat", "hit", "scourge", or "strike". Besides this verse, other meanings for *daraba* used in the Qur'an (though not with a human direct object) include 'to travel', 'to make a simile', 'to cover', 'to separate', and 'to go abroad', among others. For this reason — particularly in recent years (e.g. Ahmed Ali, Edip Yuksel) — some consider "hit" to be a misinterpretation, and believe it should be translated as "admonish them, and leave them alone in the sleeping-places and separate from them." Certain modern translations of the Qur'an in the English language accept the commoner translation of "beat" but tone down the wording with bracketed additions. Whatever *idribu hunna* is meant to convey in the Qur'an -- and multiple, complementary meanings are quite common in Islam's holy book -- the verb is directed, not at a single husband, but to the community as a whole.

Several *Hadith* urge strongly against beating one's wife, such as: "How does anyone of you beat his wife as he beats the stallion camel and then embrace (sleep with) her? (Al-Bukhari, English Translation, vol. 8, Hadith 68, pp. 42-43). "I went to the Apostle of Allah (peace be upon him) and asked him: What do you say (command) about our wives? He replied: Give them food what you have for yourself, and clothe them by which you clothe yourself, and do not beat them, and do not revile them. (Sunan Abu-Dawud, Book 11, Marriage (Kitab Al-Nikah), Number 2139)". However, some suggest that these Hadith were later abrogated, noting that in the Farewell Pilgrimage, he said:

> *Fear Allah concerning women! Verily you have taken them on the security of Allah, and intercourse with them has been made lawful unto you by words of Allah. You too have right over them, and that they should not allow anyone to sit on your bed whom you do not like. But if they do that, you can chastise them but not severely. Their rights upon you are that you should provide them with food and clothing in a fitting manner. (Narrated in Sahih Muslim, on the authority of Jabir.)* [8] (http://www.usc.edu/dept/MSA/fundamentals/hadithsunnah/muslim/007.smt.html)

According to Sheikh Yusuf al-Qaradawi, head of the European Council for Fatwa and Research:

> "If the husband senses that feelings of disobedience and rebelliousness are rising against him in his wife, he should try his best to rectify her attitude by kind words, gentle persuasion and reasoning with her. If this is not helpful, he should sleep apart from her, trying to awaken her agreeable feminine nature so that serenity may be restored, and she may respond to him in a harmonious fashion. If this approach fails, it is permissible for him to beat her lightly with his hands, avoiding her face and other sensitive parts. In no case should he resort to using a stick or any other instrument that might cause pain and injury. Rather, this 'beating' should be of the kind the Prophet (peace be on him) once mentioned to a disobedient maid-servant, when he said 'If it were not for the fear of retaliation on the Day of Resurrection, I would have beaten you with this miswak (tooth-cleaning twig)' [as reported by Ibn Majah, by Ibn Hibban in his Sahih, and by Ibn Sa'd in his Tabaqat].[9] (http://www.islamonline.net/fatwa/english/FatwaDisplay.asp?hFatwaID=7061) [10] (http://memri.de/uebersetzungen_analysen/themen/liberal_voices/ges_beating_22_03_04.pdf)

However, punishments are authorized by other passages in the Quran and Hadiths for certain crimes (e.g., extramarital sex, adultery), and are employed by some as rational for extra-legal punative action while others disagree (quotations provided by Syed Kamran Mirza (http://www.islam-

watch.org/SyedKamranMirza/honor_killing.htm)):

> Quran-24:2 *"The woman and the man guilty of adultery or fornication—flog each of them with hundred stripes. Let no compassion move you in their case, in a matter prescribed by God, if ye believe in God and the last day."*
> Quran-17:32 *"Nor come nigh to adultery: for it is a shameful (deed) and an evil, opening the road (to other evils)."*
> Sahi Muslim No. 4206: *"A woman came to the prophet and asked for purification by seeking punishment. He told her to go away and seek God's forgiveness. She persisted four times and admitted she was pregnant. He told her to wait until she had given birth. Then he said that the Muslim community should wait until she had weaned her child. When the day arrived for the child to take solid food, Muhammad handed the child over to the community. And when he had given command over her and she was put in a hole up to her breast, he ordered the people to stone her. Khalid b. al-Walid came forward with a stone which he threw at her head, and when the blood spurted on her face he cursed her."*
> Sahih Al-Bukhari Vol 2. pg 1009; and Sahih Muslim Vol 2. pg 65; *Hadhrat Abdullah ibne Abbaas (Radiallahu Anhu) narrates the lecture that Hadhrat Umar (Radiallaahu Anhu) delivered whilst sitting on the pulpit of Rasulullah (Sallallaahu Alayhi Wa Sallam). Hadhrat Umar (Radiallahu Anhu) said, "Verily, Allah sent Muhammad (Sallallaahu Alayhi Wa Sallam) with the truth, and revealed the Quran upon him. The verse regarding the stoning of the adulterer/ess was from amongst the verse revealed (in the Quraan). We read it, secured it and understood it. Rasulullah (Sallallaahu Alayhi Wa Sallam) stoned and we stoned after him. I fear that with the passage of time a person might say, 'We do not find mention of stoning in the Book of Allah and thereby go astray by leaving out an obligation revealed by Allah. Verily, the stoning of an adulterer/ress is found in the Quraan and is the truth, if the witnesses are met or there is a pregnancy or confession."*

Critics of Islamic law have often pointed to "honor killing" as an illustration to the barbarity of Shariah law. While the practice of honor killing is common in many Muslim countries, some Islamic leaders and scholars condemn the practice of honor killing, and argue the practice is not based on religious doctrine. [11] (http://womensissues.about.com/cs/honorkillings/a/honorkillings.htm).

*For a more detailed examination of the Islamic view of adultery, see* Zina

*For a more detailed examination of* "honor killing", *see the Wikipedia entry*

## Circumcision

Male circumcision involves the removal of the foreskin and is customary in most Muslim communities. It is performed at different ages in different cultures.

Female circumcision is not part of mainstream Islam. It is not practiced in Maghreb countries and most of Asia, but is performed by Muslims and non-Muslims alike across East Africa and the Nile Valley, as well as parts of the Arabian peninsula and Southeast Asia. In both areas, the custom predates Islam. Many African Muslims believe that female circumcision is required by Islam, but a large number of Muslims believe this practice has no basis in Islam. Nevertheless it is justified on religious grounds both by Muslims and Christians who practice it, mostly in parts of Africa. [citation needed]

The Egyptian-born president of the 'European Council on Fatwa and Research', Yusuf al-Qaradawi, emphasises that this is *not* a religious obligation, but expresses his personal preference for removal of the prepuce of the clitoris, called clitoridotomy (Fatwa on islamonline.net (http://www.islamonline.net/Fatwa/english/FatwaDisplay.asp?hFatwaID=31397).) The use of the term 'circumcision' is highly confusing, as the practice ranges from a mild superficial act that does not reduce any

physiological function (the 'real' circumcision) to various forms of partial or even complete removal of female genital organs. In certain countries, this is accompanied by reducing the genital opening. These forms are, because of their brutal nature, also referred to as female genital mutilation (FGM). This term is most often used in official publications of the United Nations and World Health Organization.

## Muslim apostates

*Main article: Apostasy in Islam*

In most interpretations of Shariah, conversion by Muslims to other religions is forbidden and is termed apostasy. Muslim theology equates apostasy to treason, and in most interpretations of shariah, the penalty for apostasy is death.

## Illegal sexual relations: Adultery, Fornication and Homosexuality

In most interpretations of Shariah, the death penalty is applied as penalty for homosexual acts. According to the opinions of scholars, acceptable means of performing the execution included burning, throwing from tall buildings, and stoning. [12] (http://63.175.194.25/index.php?ln=eng&ds=qa&lv=browse&QR=84140&dgn=4)

Death by stoning is also the penalty for adultery where one or two married individual are involved, while lashing with 100 strips is usually the penalty legally applied for fornication when the guilty party is not married.

## Freedom of Speech

Sharia does not allow freedom of speech on such matters as criticism of the prophet Muhammad.

> *The Qur'an says that Allah curses the one who harms the Prophet in this world and He connected harm of Himself to harm of the Prophet. There is no dispute that anyone who curses Allah is killed and that his curse demands that he be categorized as an unbeliever. The judgement of the unbeliever is that he is killed. [...] There is a difference between ... harming Allah and His Messenger and harming the believers. Injuring the believers, short of murder, incurs beating and exemplary punishment. The judgement against those who harm Allah and His Prophet is more severe -- the death penalty.* ("The proof of the necessity of killing anyone who curses the Prophet or finds fault with him" [13] (http://www.masud.co.uk/ISLAM/misc/alshifa/pt4ch1sec2.htm))

In Egypt, public authorities annulled, without his consent, the marriage of Prof. Nasr Abu Zayd when he got in conflict with an orthodox Islamic cleric from the Al-Azhar University in Cairo. The cleric had condemned Abu Zayd's reading of the Qur'an as being against the orthodox interpretation and labelled him an apostate (seen as a non-believer and consequently not permitted to marry or stay married to a Muslim woman). Abu Zayd fled to the Netherlands, where he is now a professor at the university of Leiden.

This was demonstrated recently in the cartoon row with the West.

# See also

- Islamic Rulings - A list of the most controversial rulings in Islam
- Islam in Turkey - the only secular state of Muslim world
- Hudud - Severe crimes (sometimes considered "crimes against God")
- Tazir - Less severe crimes (thus, "crimes against society", not God)
- Qisas - retaliatory crimes

- Din
- Islamic banking
- Homosexuality and Islam
- Cairo Declaration on Human Rights in Islam

# References

- Daniel W. Brown (1996). *Rethinking traditions in modern Islamic thought*. Cambridge University Press, UK. ISBN 0521653940
- Wael B. Hallaq (2001). *Authority, Continuity and Change in Islamic Law*. Cambridge University Press. ISBN 0521803314
- Wael B. Hallaq (1997). *History of Islamic Legal Theories: An Introduction to Sunni Usul Al-Fiqh*. Cambridge University Press. ISBN 0521590272
- Tariq Ramadan (2005). *Western Muslims and the Future of Islam*. Oxford University Press, USA. ISBN 0195183568
- Reza Aslan (2006). *No God but God: The Origins, Evolution, and Future of Islam*. Random House Publishing Group. ISBN 0812971892
- Cemal Kafadar (1996). *Between Two Worlds: The Construction of the Ottoman State*. University of California Press. ISBN 0520206002
- Omid Safi (2003). *Progressive Muslims: On Justice, Gender, and Pluralism*. Oneworld Publications. ISBN 185168316X
- Mumisa, Michael (2002) *Islamic Law: Theory & Interpretation*. Amana Publications. ISBN 1590080106

# External links

## Muslim websites

### Sunni websites

- The Purposes of the Shari'ah (http://www.islaam.com/Article.aspx?id=500)
- Basic principle: The penal law of Islam (http://www.servantsofallah.org/penallaw.htm)
- Islamic Law: Myths and Realities (http://muslim-canada.org/Islam_myths.htm)

### Reformist websites

- Islamic Law: An Ever-Evolving Science Under The Light of Divine Revelation and Human Reason (http://www.averroes-foundation.org/articles/islamic_law_evolving.html)

Retrieved from "http://en.wikipedia.org/wiki/Sharia"

Categories: Articles lacking sources | Arabic words | Islamic law | Legal codes

---

- This page was last modified 06:32, 28 March 2006.
- All text is available under the terms of the GNU Free Documentation License (see **Copyrights** for details).
  Wikipedia® is a registered trademark of the

Wikimedia Foundation, Inc.

- Privacy policy
- About Wikipedia
- Disclaimers

DEFENDANT'S
EXHIBIT
5

DEFENDANT'S
EXHIBIT
6

Workman Middle School
This certifies that
Malik Elawad
has been awarded this special certificate for
Excellence in Keyboarding
May 21, 1998
Date
Teacher
Principal
7th
Grade
DEFENDANT'S EXHIBIT
7





The National Beta Club

*This Certifies that*

Malik Elawad

*of the*

Booker T. Washington High School

*Because of outstanding character and achievement*
*has been elected to membership*
this 1st day of May 2000

EXECUTIVE DIRECTOR
SPONSOR

CHAIRMAN of the BOARD

SUPERINTENDENT OR PRI

DEFENDANT'S EXHIBIT 8



SECRETARY OF THE NAVY

# Scholastic Leadership Award

**The Secretary of the Navy takes great pleasure in presenting this award for outstanding leadership to**

Malik Elawad

In Military Bearing and Academic Achievement

**For exhibiting the traits of leadership. Your initiative and good judgment inspires trust and strengthens others, and you lead by example through your optimism, enthusiasm, and integrity. Congratulations on a job well done, and best wishes in all your future endeavors.**

Richard Danzig
Secretary of the Navy

TO DISTRICT: 0000017 ESCAMBIA SCHOOL: 0851 DEMOGRAPHIC INFORMATION FILE: SRTSIDAL
GRADE LEVEL: 11 PREPARED DATE: 02/03/2006 CURRENT DISTRICT: 17 ESCAMBIA PAGE 11
FL STUDENT ID: 591987029X SSN: 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 CURRENT SCHOOL: 0851 WOODHAM HIGH

LEGAL NAME: ELAWAD, MALIK SALMAN
MAILING 3511 RIVERINA DR
ADDRESS: PENSACOLA FL 32514
DISTRICT STUDENT ID: 095593 FL STUDENT ID-ALIAS: 1700095593
PARENT/GUARDIAN (NAME/CODE):
SALMAN ELEWAD PARENT
MAIMOONM MOHAMED PARENT
SHIRLEY IBRAHIM OTHER RELATIVE

(850) 494-7140
30 E BURGESS RD
PENSACOLA FL 32503
RACIAL/ETHNIC CATEGORY: B SEX: M
BIRTH DATE: 02/26/1985 BIRTH VERIFICATION: 1
BIRTHPLACE: GEDARD SUDAN

IMMUNIZATION STATUS: PERMANENT CERTIFICATE DOCUMENTING MIDDLE SCHOOL & GEN. IMMUNIZATION REQUIREMENTS
VACCINE STATUS DATE VACCINE CERTIFICATE EXPIRATION DATE:

| TYPE | DOSE | DATE | DOSE | DATE | DOSE | DATE | DOSE | DATE | DOSE | DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| DTP | 1 | 08/17/1990 | 2 | 11/07/1990 | 3 | 06/05/1991 | 4 | 04/16/1992 | | |
| TD | 1 | 05/20/1997 | | | | | | | | |
| POLIO | 1 | 08/17/1990 | 2 | 11/07/1990 | 3 | 06/05/1991 | 4 | 04/16/1992 | | |
| MMR | 1 | 08/17/1990 | 2 | 04/17/1997 | | | | | | |
| HEPATITIS B | 1 | 04/17/1997 | 2 | 11/20/1997 | 3 | 10/13/1998 | | | | |

---------- COURSE INFORMATION ----------

DISTRICT: 17 SCHOOL: 0351 WASHINGTON HIGH
YEAR: 1998-1999 GRADE LEVEL: 09

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | GRD | CREDIT ATT. | CREDIT EARN |
|---|---|---|---|---|---|---|---|
| 4 | 8502000 | LIFE MANAGEMENT SKIL | LM | R | B | 0.50 | 0.50 |
| | | CREDIT, TERM: | | | | 0.50 | 0.50 |

| | GPA | QTY PTS | | GPA | QTY PTS |
|---|---|---|---|---|---|
| DISTRICT-TERM: | 3.0000 | 1.50 | CUM: | 3.0000 | 1.50 |
| STATE-TERM: | 3.0000 | 1.50 | CUM: | 3.0000 | 1.50 |

1998-1999 ANNUAL DAYS-PRESENT: 174 ABSENT: 6
SUMMER TERMS DAYS-PRESENT: 19 ABSENT: 0
ACADEMICALLY PROMOTED

DISTRICT: 17 SCHOOL: 0351 WASHINGTON HIGH
YEAR: 1999-2000 GRADE LEVEL: 09

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | GRD | CREDIT ATT. | CREDIT EARN |
|---|---|---|---|---|---|---|---|
| 1 | 0708340 | SPANISH I | FL | R | A | 0.50 | 0.50 |
| 1 | 1001310 | ENG I | EN | R | A | 0.50 | 0.50 |
| 1 | 1100340 | MULTIMEDIA PROD | EL | | A | 0.50 | 0.50 |
| 1 | 1200320 | ALGEBRA I HON | MA | RH | B | 0.50 | 0.50 |
| 1 | 1501300 | PERSONAL FIT | PE | R | A | 0.50 | 0.50 |
| 1 | 1802300 | NAVAL SCI I | EL | | A | 0.50 | 0.50 |
| 1 | 2000320 | BIOLOGY I HON | SC | RH | A | 0.50 | 0.50 |
| 1 | 2103300 | WORLD CULT GEOGRAPHY | EL | | A | 0.50 | 0.50 |
| 2 | 0708340 | SPANISH I | FL | R | A | 0.50 | 0.50 |
| 2 | 1001310 | ENG I | EN | R | A | 0.50 | 0.50 |
| 2 | 1100340 | MULTIMEDIA PROD | EL | | A | 0.50 | 0.50 |
| 2 | 1200320 | ALGEBRA I HON | MA | RH | B | 0.50 | 0.50 |
| 2 | 1503350 | TEAM SPORTS I | EL | | B | 0.50 | 0.50 |
| 2 | 1802300 | NAVAL SCI I | EL | | A | 0.50 | 0.50 |
| 2 | 2000320 | BIOLOGY I HON | SC | RH | A | 0.50 | 0.50 |
| 2 | 8500355 | NUTRITION & WELLNESS | VO | | B | 0.50 | 0.50 |
| | | CREDIT, TERM: | | | | 8.00 | 8.00 |

| | GPA | QTY PTS | | GPA | QTY PTS |
|---|---|---|---|---|---|
| DISTRICT-TERM: | 3.8500 | 30.00 | CUM: | 3.8058 | 31.50 |
| STATE-TERM: | 3.7500 | 30.00 | CUM: | 3.7058 | 31.50 |

1999-2000 ANNUAL DAYS-PRESENT: 178 ABSENT: 2
SUMMER TERMS DAYS-PRESENT: 0 ABSENT: 0
ACADEMICALLY PROMOTED

DISTRICT: 17 SCHOOL: 0851 WOODHAM HIGH
YEAR: 2000-2001 GRADE LEVEL: 10

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | GRD | CREDIT ATT. | CREDIT EARN |
|---|---|---|---|---|---|---|---|
| 1 | 0708350 | SPANISH II | FL | | B | 0.50 | 0.50 |
| 1 | 1001340 | ENG II | EN | | A | 0.50 | 0.50 |
| 1 | 1009300 | WRITING I | EN | | A | 0.50 | 0.50 |
| 1 | 1206320 | GEOMETRY HON | MA | H | C | 0.50 | 0.50 |
| 1 | 1503410 | INTER AEROBICS | EL | | A | 0.50 | 0.50 |
| 1 | 2003350 | CHEMISTRY I HON | SC | H | A | 0.50 | 0.50 |
| 1 | 2104320 | WORLD HISTORY HONORS | WH | H | B | 0.50 | 0.50 |
| 1 | 8417100 | HEALTH SCIENCE 1 | VO | | A | 0.50 | 0.50 |
| 2 | 0708350 | SPANISH II | FL | | A | 0.50 | 0.50 |

DISTRICT: 17 SCHOOL: 0351 WASHINGTON HIGH
YEAR: 2000-2001 GRADE LEVEL: 10

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | GRD | CREDIT ATT. | CREDIT EARN |
|---|---|---|---|---|---|---|---|
| 2 | 1001340 | ENG II | EN | | A | 0.50 | 0.50 |

DISTRICT: 17 SCHOOL: 0851 WOODHAM HIGH
YEAR: 2000-2001 GRADE LEVEL: 10

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | GRD | CREDIT ATT. | CREDIT EARN |
|---|---|---|---|---|---|---|---|
| 2 | 1206320 | GEOMETRY HON | MA | H | B | 0.50 | 0.50 |
| 2 | 1900310 | DRIVER ED CLASS/LAB | EL | | B | 0.50 | 0.50 |
| 2 | 2003350 | CHEMISTRY I HON | SC | H | A | 0.50 | 0.50 |
| 2 | 2109320 | WORLD HISTORY HONORS | WH | H | B | 0.50 | 0.50 |
| 2 | 8417100 | HEALTH SCIENCE 1 | VO | | A | 0.50 | 0.50 |
| | | CREDIT, TERM: | | | | 7.50 | 7.50 |

| | GPA | QTY PTS | | GPA | QTY PTS |
|---|---|---|---|---|---|
| DISTRICT TERM: | 3.6833 | 26.50 | CUM: | 3.8750 | 58.00 |
| STATE TERM: | 3.5333 | 26.50 | CUM: | 3.6250 | 58.00 |

2000-2001 ANNUAL DAYS-PRESENT: 174 ABSENT: 6
SUMMER TERMS DAYS-PRESENT: 0 ABSENT: 0
ACADEMICALLY PROMOTED

DEFENDANT'S
EXHIBIT
10

TO - DISTRICT 000001? ESCAMBIA SCHOOL: 0851 GRADUATION SUMMARY FILE: SRTSLIAS
GRADE LEVEL: 11 PREPARED DATE: 02/09/2006 CURRENT DISTRICT: 17 ESCAMBIA PAGE 02
FL STUDENT ID: 591987??9X SSN: 591-98-?229 CURRENT SCHOOL: 0851 WOODHAM HIGH

LEGAL NAME: ELAWAD, MALIK SALMAN 850 494-7140

****** C U M U L A T I V E S U M M A R Y ******
AS OF 02/09/2006

GRADUATION OPTION: 4-YR STANDARD

| SUBJECT AREA | | TOTAL TO DATE | TOTAL NEEDED | TOTAL REMAINING |
|---|---|---|---|---|
| ENGLISH | (EN) | 2.50 | 4.00 | 1.50 |
| MATHEMATICS | (MA) | 2.00 | 3.00 | 1.00 |
| SCIENCE | (SC) | 2.00 | 3.00 | 1.00 |
| AMER HISTORY | (AH) | 0.00 | 1.00 | 1.00 |
| WORLD HISTORY | (WH) | 1.00 | 1.00 | 0.00 |
| ECONOMICS | (EC) | 0.00 | 0.50 | 0.50 |
| AMER GOVERNMENT | (AG) | 0.00 | 0.50 | 0.50 |
| VOCATIONAL/ | (VO) | 1.50 | | |
| PERFORM FINE ART | (PF) | 0.00 | 1.00* | 0.00* |
| LIFE MGMT SKILLS | (LM) | 0.50 | 0.50 | 0.00 |
| PHYSICAL ED | (PE) | 0.50 | 0.50 | 0.00 |
| FOREIGN LANGUAGE | (FL) | 2.00 | | 0.00 |
| LANGUAGE ARTS | (LA) | 0.00 | | |
| SOCIAL STUDIES | (SS) | 0.00 | | |
| ELECTIVE | (EL) | 4.00 | 9.00 | 2.50 |
| ESE | (EX) | 0.00 | | |
| COMPUTER ED | (CE) | 0.00 | | |
| CREDITS, CUMULATIVE: | | 16.00 | 24.00 | 8.00 |

* TOTALS INCLUDE VOCATIONAL & PERFORM FINE ARTS

GPA QTY PTS GPA QTY PTS
DISTRICT: 3.8750 58.00 STATE: 3.6250 58.00

DIPLOMA-DATE:
TYPE:
WITH: NA
ADV INTL CERTIFICATE: Z

VOCATIONAL PROGRAM COMPLETION STATUS-
NUMBER: 8417130 HEALTH SCIENCE 1
TERMINATION: REMAINING COMPLETED:
VOCATIONAL PROGRAM COMPLETION STATUS-
NUMBER: 8500355 NUTRITION & WELLNESS
TERMINATION: IN PROGRESS COMPLETED:
VOCATIONAL PROGRAM COMPLETION STATUS-
NUMBER: 8502000 LIFE MANAGEMENT SKIL
TERMINATION: IN PROGRESS COMPLETED: 06/16/1999

DISTRICT CLASS RANK- EFFECTIVE DATE: 09/12/2001
CLASS RANK, NUMERICAL POSITION: 23
CLASS RANK PERCENTILE: 7
CLASS RANK, TOTAL NUMBER IN CLASS: 335

DATE PASSED ASSESSMENT TEST FOR GRADUATION PURPOSES
COMMUNICATIONS: 03/2001
MATHEMATICS: 03/2001

COMMUNITY SERVICE HOURS: 0 REQUIREMENT MET: N

CERTIFIED BY:

SIGNATURE: [signature]

DATE: 2-9-06

DEFINITION OF TERM CODES

| CODE | DEFINITION | CODE | DEFINITION | CODE | DEFINITION | CODE | DEFINITION | CODE | DEFINITION |
|---|---|---|---|---|---|---|---|---|---|
| 1 | SEMESTER 1 | S | COMBINED SUMMER SESSION | B | TRIMESTER 1 | E | QUINMESTER 1 | J | SIX WEEKS 1 |
| 2 | SEMESTER 2 | | | C | TRIMESTER 2 | F | QUINMESTER 2 | K | SIX WEEKS 2 |
| 3 | ANNUAL | T | INTERSESSION 1* | D | TRIMESTER 3 | G | QUINMESTER 3 | L | SIX WEEKS 3 |
| 4 | SUMMER SESSION 1 | U | INTERSESSION 2* | 6 | QUARTER 1 | H | QUINMESTER 4 | M | SIX WEEKS 4 |
| 5 | SUMMER SESSION 2 | V | INTERSESSION 3* | 7 | QUARTER 2 | I | QUINMESTER 5 | N | SIX WEEKS 5 |
| R | SHORT COURSE** | W | INTERSESSION 4* | 8 | QUARTER 3 | Y | YEAR OF NONENROLLMENT*** | O | SIX WEEKS 6 |
| | | X | INTERSESSION 5* | 9 | QUARTER 4 | | | | |

* USED INSTEAD OF SUMMER SCHOOL SESSIONS WITH YEAR-ROUND SCHOOL RECORDKEEPING
** USED ONLY FOR WORKFORCE DEVELOPMENT EDUCATION (ADULT GENERAL AND POSTSECONDARY VOCATIONAL EDUCATION
*** USED ONLY FOR REPORTING STUDENTS WHO HAVE WITHDRAWN BETWEEN SCHOOL YEARS

STATE GRADING SCALE FOR HIGH SCHOOL STUDENTS (REGARDLESS OF ENTRY DATE) EFFECTIVE SCHOOL YEAR 1997-1998

GRADING SCALE, EFFECTIVE 07/01/2001

| GRADE | GRADE EQUIVALENT | QUALITY POINTS | GRADE | GRADE EQUIVALENT | QUALITY POINTS | GRADE | GRADE EQUIVALENT | QUALITY POINTS |
|---|---|---|---|---|---|---|---|---|
| A = | 90 - 100 | 4.00 | B = | 80 - 89 | 3.00 | C = | 70 - 79 | 2.00 |
| D = | 60 - 69 | 1.00 | F = | 0 - 59 | 0.00 | | | |

GRADING SCALE, PRIOR TO 07/01/2001

| GRADE | GRADE EQUIVALENT | QUALITY POINTS | GRADE | GRADE EQUIVALENT | QUALITY POINTS | GRADE | GRADE EQUIVALENT | QUALITY POINTS |
|---|---|---|---|---|---|---|---|---|
| A = | 94 - 100 | 4.00 | B = | 85 - 93 | 3.00 | C = | 77 - 84 | 2.00 |
| D = | 70 - 76 | 1.00 | F = | 0 - 69 | 0.00 | | | |

NOTE: FROM THE 1987-1988 THROUGH THE 1996-1997 SCHOOL YEARS, FOR STUDENTS ENTERING HIGH SCHOOL DURING THESE YEARS, THE GRADE EQUIVALENTS FOR C, D, AND F WERE: C = 75-84, D = 65-74, AND F = 0-64; QUALITY POINTS AND ALL OTHER GRADES WERE THE SAME AS THOSE SHOWN IN THE IMMEDIATELY PRECEDING STATE GRADING SCALE.

STATE DEFINED COURSE FLAGS

E=ACADEMIC SCHOLAR-ELECTIVE
G=GIFTED
I=INCLUDE IN GPA
P=COURSE IS IN PROGRESS
R=ACADEMIC SCHOLAR REQUIREMENT
H=HONORS
X=EXCLUDE FROM GPA
S=CREDIT AWARDED BY CLEP EXAM
9=NINTH GRADER
N=NO CREDIT
W=EXCLUDE FROM STATE GPA
T=TRANSFERRED COURSE

VOCATIONAL SUBSTITUTION COURSES
$=JOURNALISM SUB FOR PRAC ARTS
2=SUB FOR BUS EN I 1001440
5=SUB FOR MA I 1205380/II 1205390
8=SUB FOR PRE ALGEBRA 1200300
K=JROTC NAVY SUB FOR SCIENCE
4=SUB FOR BIO TECH 2000430
(=JROTC SUB FOR PRACTICAL ARTS
3=SUB FOR BUS EN I 1001440/II 1001450
6=SUB FOR GEN SCI 2002310
A=JROTC CST GD SUB FOR SCIENCE
D=JROTC ARMY SUB FOR LIFE MGMT
#=SUB FOR ENV SCI 2001340
&=JROTC AIR FC SUB FOR LIFE MGMT
1=COMP ED SUB FOR PRACTICAL ARTS
4=SUB FOR MA I 1205340
7=SUB FOR ANAT PHYSIO 2000350
F=JROTC AIR FC SUB FOR SCIENCE
Q=JROTC MARINE SUB FOR LIFE MGMT
%=SUB FOR PHY SCI 2003310

LEP INSTRUCTION
M=HOME LANGUAGE INSTRUCTION
E=ESOL INSTRUCTION
B=HOME LANGUAGE AND/OR ESOL INSTRUCTION (ELEMENTARY SELF-CONTAINED)

GENERAL COMMENTS

THE DISTRICT GPA IS CALCULATED BY ADDING 0.025 TO THE UNWEIGHTED STATE GPA FOR EACH PASSING SEMESTER GRADE, 'D' OR HIGHER, IN HONORS COURSES.

LOCAL/OTHER GRADES

I = INCOMPLETE, HIGH SCHOOL: NG = NO GRADE, MIDDLE SCHOOL: N = NO GRADE
ELEMENTARY SCHOOL: A = EXCELLENT, B = ABOVE AVERAGE, C = AVERAGE, D = BELOW AVERAGE, F = FAILING, S = SATISFACTORY, N = NEEDS MORE TIME AND HELP

DISTRICT COURSE FLAGS

Y = CREDIT AWARDED BECAUSE YEAR AVERAGE IN COURSE IS PASSING.
C = COURSE TAKEN IN COMMUNITY SCHOOL. 9 = NINTH GRADE COURSE

TO : DISTRICT : SCHOOL / ESCAMBIA                    SCHOOL : 1461  COMMENTS                    FILE  547XXXA7
GRADE LEVEL : 11  PREPARED DATE  : 10/19/2006        CURRENT DISTRICT: 17 ESCAMBIA                      PAGE 1
PLACEMENT TO : 09198711YX  SSN: 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          CURRENT SCHOOL: 1461 WPXIRAM HIGH

LEGAL NAME: KLAWALL, MALIK NALMAN                    850  434-7141

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GENERAL COMMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
              . . . . . . . . . . . . . . . . .                         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .



Awards Mr. Elawad received from 2001-2002
while a student at Central High School in
Phenix City, Alabama
02

DEFENDANT'S EXHIBIT 11



PHENIX CITY PUBLIC SCHOOLS
CENTRAL HIGH SCHOOL HEALTH CARE ACADEMY

# HOSA

*Certificate of Recognition*

Awarded to

Malik Elawad

In recognition of

1ST Place - Dental Spelling

Dated this 18TH day of December, 2002

Presented by: Ardie Fredrick

Linda Watkins

DEFENDANT'S EXHIBIT 11

# Central High School

Phenix City, Alabama

This Certifies That

## Malik S. Elawad

Has satisfactorily completed a Course of Study prescribed by the Board of Education and approved by the Southern Association of Colleges and Secondary Schools and is therefore awarded this

## Diploma

Given in this twenty-third day of May, two thousand three

TECHNICAL DIPLOMA ALABAMA

ALABAMA GREAT SEAL

Carey S. East
Principal

Florence W. Bellamy
Chairman of Board

Superintendent

DEFENDANT'S EXHIBIT 13

A BLACK & WHITE DOCUMENT IS NOT OFFICIAL

CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE
P. O. BOX 1000
2602 COLLEGE DRIVE
PHENIX CITY, ALABAMA 36868-1000

(334) 291-4900 FAX (334) 291-4994
FICE CODE: 012182

MALIK SALMAN ELAWAD 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 02/09/2006
PAGE 1

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|
| | --- 2001-2002 FALL --- PRO/OPT: UND NCA | | | |
| BIO103 | PRINCIPLES OF BIOLOGY I | A | 4.000 | 16.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 4.000 4.000 16.000 4.000 | | | |
| CUM | 4.000 4.000 16.000 4.000 | | | |
| | --- 2001-2002 SPRING --- PRO/OPT: UND NCA | | | |
| BIO104 | PRINCIPLES OF BIOLOGY II | B | 4.000 | 12.000 |
| MTH113 | PRECALCULUS WITH TRIGONOMETRY | B | 3.000 | 9.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 7.000 7.000 21.000 3.000 | | | |
| CUM | 11.000 11.000 37.000 3.364 | | | |
| | --- 2001-2002 SUMMER --- PRO/OPT: UND NCA | | | |
| BIO201 | HUMAN ANATOMY & PHYSIOLOGY I | W | 4.000 | |
| GEO100 | WORLD REGIONAL GEOGRAPHY | A | 3.000 | 12.000 |
| SOC200 | INTRODUCTION TO SOCIOLOGY | A | 3.000 | 12.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 6.000 6.000 24.000 4.000 | | | |
| CUM | 17.000 17.000 61.000 3.588 | | | |
| | --- 2002-2003 FALL --- PRO/OPT: UND NCA | | | |
| BIO201 | HUMAN ANATOMY & PHYSIOLOGY I | B | 4.000 | 12.000 |
| HIS201 | UNITED STATES HISTORY I | A | 3.000 | 12.000 |
| MTH125 | CALCULUS I | B | 4.000 | 12.000 |
| PED103 | BEGINNING WEIGHT TRAINING | A | 1.000 | 4.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 12.000 12.000 40.000 3.333 | | | |
| CUM | 29.000 29.000 101.000 3.483 | | | |
| | --- 2002-2003 SPRING --- PRO/OPT: UND NCA | | | |
| BIO202 | HUMAN ANATOMY & PHYSIOLOGY II | B | 4.000 | 12.000 |
| MTH126 | CALCULUS II | C | 4.000 | 8.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |

*** NO FURTHER ENTRIES THIS COLUMN ***

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|
| | --- 2002-2003 SPRING --- (CONTINUED) | | | |
| CUR | 8.000 8.000 20.000 2.500 | | | |
| CUM | 37.000 37.000 121.000 3.270 | | | |
| | --- 2002-2003 SUMMER --- PRO/OPT: GEN AS | | | |
| ART100 | ART APPRECIATION | W | 3.000 | |
| ENG101 | ENGLISH COMPOSITION SKILLS I | B | 3.000 | 9.000 |
| HIS121 | WORLD HISTORY I | B | 3.000 | 9.000 |
| PSY200 | GENERAL PSYCHOLOGY | A | 3.000 | 12.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 9.000 9.000 30.000 3.333 | | | |
| CUM | 46.000 46.000 151.000 3.283 | | | |
| | --- 2003-2004 FALL --- PRO/OPT: GEN AS | | | |
| ART100 | ART APPRECIATION | A | 3.000 | 12.000 |
| CHM111 | COLLEGE CHEMISTRY I | C | 4.000 | 8.000 |
| CIS146 | MICROCOMPUTER APPLICATIONS | A | 3.000 | 12.000 |
| ENG102 | ENGLISH COMPOSITION II | B | 3.000 | 9.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 13.000 13.000 41.000 3.154 | | | |
| CUM | 59.000 59.000 192.000 3.254 | | | |
| | --- 2003-2004 SPRING --- PRO/OPT: GEN AS | | | |
| ENG271 | WORLD LITERATURE I | F | 3.000 | |
| HIS202 | UNITED STATES HISTORY II | W | 3.000 | |
| MUS101 | MUSIC APPRECIATION | B | 3.000 | 9.000 |
| PSY100 | ORIENTATION | A | 1.000 | 4.000 |
| SPH107 | FUNDAMENTALS OF PUB. SPEAKING | C | 3.000 | 6.000 |
| | AHRS DHRS EHRS QHRS QPTS GPA | | | |
| CUR | 7.000 10.000 19.000 1.900 | | | |
| CUM | 66.000 69.000 211.000 3.058 | | | |
| | --- 2003-2004 SUMMER --- PRO/OPT: GEN AS | | | |
| HIS202 | UNITED STATES HISTORY II | B | 3.000 | 9.000 |

*** TRANSCRIPT CONTINUED NEXT PAGE ***

David N. Hodge, Ed.D.
Dean of Student & Admin

ADDRESSEE:

FEDERAL DEFENDERS
MIDDLE DISTRICT OF AL
201 MONROE ST SUITE 407
MONTGOMERY AL 36104

DEFENDANT'S EXHIBIT
14

THE NAME OF THE COLLEGE APPEARS IN BLUE ACROSS THE FACE OF THIS DOCUMENT

A BLACK & WHITE DOCUMENT IS NOT OFFICIAL

CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE
P. O. BOX 1000
2602 COLLEGE DRIVE
PHENIX CITY, ALABAMA 36868-1000

(334) 291-4900 FAX (334) 291-4994
FICE CODE: 012182

MALIK SALMAN ELAWAD 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 02/09/2006
PAGE 2

| COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS | COURSE NO | COURSE NAME | GRADE | CR HRS | QPTS |
|---|---|---|---|---|---|---|---|---|---|

--- 2003-2004 SUMMER --- (CONTINUED)

| | AHRS | DHRS | EHRS | QHRS | QPTS | GPA |
|---|---|---|---|---|---|---|
| CUR | | | 3.000 | 3.000 | 9.000 | 3.000 |
| CUM | | | 69.000 | 72.000 | 220.000 | 3.056 |

***** END OF ACADEMIC RECORD *****

David N. Hodge, Ed.D.
Dean of Student & Admin

ADDRESSEE:
FEDERAL DEFENDERS
MIDDLE DISTRICT OF AL
201 MONROE ST SUITE 407
MONTGOMERY AL 36104

THE NAME OF THE COLLEGE APPEARS IN BLUE ACROSS THE FACE OF THIS BLUE DOCUMENT

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
PROBATION OFFICE

JOSEPH T. NASH
CHIEF PROBATION OFFICER

LESLIE P. CRAFT
DEPUTY CHIEF PROBATION OFFICER

One Court Square, Suite 249
P.O. Box 39
Montgomery, AL 36101-0039

R. DWAYNE SPURLOCK
SUPERVISING PROBATION OFFICER
*INVESTIGATIVE UNIT*

SCOTT WRIGHT
SUPERVISING PROBATION OFFICER
*SUPERVISION UNIT*

Voice 334/954-3241
FAX 334/206 6398

March 15, 2006

Ms. Christine Freeman/Patricia Kemp
201 Monroe Street, Suite 407
Montgomery, AL 36104

Re: U.S.A. vs. Malik Elawad
Docket Number: 3:05cr188-LSC
Sentencing Date: April 26, 2006
Objections Due: March 29, 2006
Conference Date: April 12, 2006, at 10 a.m.

Dear Ms. Freeman/Ms. Kemp:

Enclosed is the Presentence Report completed in the case of the above-named defendant. Please note the Court's Local Rule for the Implementation of Guideline Sentencing. Objections to any **material information, sentencing classifications, sentencing Guideline ranges, and policy statements** contained in or omitted from the Presentence Report must be submitted in writing to the U.S. Probation Officer by the date listed above.

**If your client is in custody in a facility other than the Montgomery City Jail and you feel that a telephone conference with your client is sufficient, you may contact him/her by telephone to discuss the Presentence Report. If you have difficulty in contacting your client by telephone, or if you find it necessary to see your client in person, contact the U. S. Marshal's Office at (223-7401) within 72 hours after receipt of this letter to make the necessary arrangements.**

When submitting objections to sentencing classifications, sentencing Guidelines ranges, and policy statements from the Guidelines, **the appropriate citation in the Guidelines,** which justifies your position, should be noted. When objecting to material information which is felt to be in error, **please provide verification** to support your position or provide a source for such verification.

DEFENDANT'S
EXHIBIT
15

Ms. Christine Freeman
March 15, 2006
Page No. Two

Re: U.S.A. vs. Malik Elawad
Docket Number: 3:05cr188-LSC
Sentencing Date: April 26, 2006

If you have no objections to the Presentence Report, please advise in writing on or before the date noted above.

After receiving objections from the defendant, defense counsel, or U. S. Attorney, a telephonic conference will be held to discuss **unresolved factual and legal issues.** A date and time for this conference has been previously set by Court Order. If any of the parties find it necessary to resolve these issues in a meeting rather than a telephonic conference, please advise me within five (5) days of receipt of this letter.

The written response to the initial report should **not** be filed with the Court. The Court receives only the final (revised) copy of the presentence report with an addendum containing any unresolved objections.

The Presentence Report is a confidential document and as a general rule is not available without the Court's permission to anyone other than the defendant, the defendant's attorney and the prosecutor. Please do not make copies of the initial or revised report.

Sincerely yours,

Jeffrey Lee
United States Probation Officer

Enclosures

cc: Todd Brown
Assistant U.S. Attorney

Malik Elawad
Montgomery City Jail

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| **Malik Elawad** | ) | **DOCKET NO.: 3:05CR121-LSC** |

---

**Prepared For:** The Honorable L. Scott Coogler
United States District Judge

**Prepared By:** Jeffrey Lee
United States Probation Officer
(334) 954-3241

**Prosecuting Attorney**
**Todd Brown**
P.O. Box 197
Montgomery, AL 36101
(334) 223-7280

**Defense Counsel**
**Christine Freeman/Patricia Kemp**
201 Monroe Street, Suite 407
Montgomery, AL 36104
(334) 834-2099

**Sentence Date:** **April 26, 2006, at 10:00am**

**Offenses:**

*Count 1:* Bank Robbery by Force [18 U.S.C. § 2113(a) and (d)] Not More than 25 years and/or $250,000 fine. A Class B felony.

*Count 2:* Discharge of a Firearm during the Commission of a Crime of Violence and Aiding and Abetting [18 U.S.C. §§ 924(c)(1)(A)(iii) and 2] 10 years (Consecutive) confinement and/or $250,000 fine. A Class C felony.

**Release Status:** The defendant was arrested May 5, 2005, and held without bond. He remains in such status.

**Detainers:** Yes — Columbus, Georgia Police Department

**Codefendants:** None

**Related Cases:** None

**Date Report Prepared:** March 15, 2006 **Date Report Revised:**

**Identifying Data**

**Pacts #5782**

| | |
|---|---|
| **Legal Name:** | Malik Salman Elawad |
| **Date of Birth:** | February 26, 1985 |
| **Age:** | 21 |
| **Race:** | Black/non-Hispanic |
| **Sex:** | Male |
| **SSN No.:** | 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 |
| **FBI No.:** | 659777RB6 |
| **U.S. Marshal No.:** | 56894-019 |
| **Other ID No.:** | Florida State ID: FL05359933 |
| **Marital Status:** | Single |
| **Education:** | Some College |
| **Dependents:** | None |
| **Citizenship:** | Permanent Resident |
| **Legal Address:** | 3003 Thornberry Circle<br>Phenix City, Alabama 36867 |
| **Telephone #:** | (334)214-5924 |
| **Aliases:** | None |

***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorists activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

**PART A. THE OFFENSE**

**Charge(s) and Conviction(s)**

1 On May 25, 2005, a 2-count Indictment was filed against Malik Elawad in the United States District Court for the Middle District of Alabama. The Indictment charged the defendant with **Count 1**, Bank Robbery by Force, 18 U.S.C. § 2113(a) and (d); and **Count 2**, Discharge of a Firearm During Commission of a Crime of Violence, 18 U.S.C. § 924(c)(1)(A)(iii). The criminal conduct set forth in the Indictment occurred on May 2, 2005.

2. On February 6, 2006, the defendant pled guilty to Counts 1 and 2, in accordance with a written Rule 11(c)(1)(C) plea agreement. He understood that pursuant to 18 U.S.C. § 2113(a) and (d), Bank Robbery by Force carries a maximum penalty of not more than 25 years imprisonment, a fine of not more than $250,000, and a period of supervised release of not more than 5 years. He further understood that pursuant to 18 U.S.C. § 924(c)(1)(A)(iii), Discharge of a Firearm During a Crime of Violence carries a penalty of not less than 10 years consecutive to the crime of violence, a fine of not more than $250,000, and a period of supervised release of not more than 3 years. The defendant agreed to pay a special assessment of $200 to the Clerk of Court for the United States District Court for the Middle District of Alabama.

3. The defendant understood that by entering a plea of guilty he waived his rights to a trial by jury. He agreed that he is subject to a 4-level enhancement because the firearm was discharged in commission of the offense. He acknowledged that if the Court does not accept the plea agreement he is permitted to withdraw his plea and that there is no possibility of probation. The defendant waived appeal and collateral attack, however, he reserved the right to appeal an upward departure from the applicable guideline range.

4. The government will not oppose a 2-level reduction for acceptance of responsibility and will move for an additional 1-level reduction at the time of sentencing. The government agreed the defendant is entitled to a reduction of 2 levels for a minor role, pursuant to U.S.S.G. §3B1.2(b), and that there is no enhancement applicable pursuant to U.S.S.G. §2B3.1(b)(2)(A), because of his conviction in Count 2. The government further agreed to recommend a sentence at the low end of the guideline range, including the minimum sentence of 10 years on Count 2. In addition, the government will recommend the sentence imposed run concurrently with any sentence imposed by the State of Georgia.

5. Defendant Elawad was arrested on May 5, 2005, and has been held without bond since that time.

**The Offense Conduct**

6. On May 2, 2005, the defendant and Morgan Chigawa (deceased) entered the Regions Bank located at 3548 Highway 280/431 North, Phenix City, Alabama. The defendants stood in a teller line and appeared to be waiting for service.

7. As Defendant Chigawa approached the teller counter, he informed that he wanted to open an account. During the exchange with the teller, a scream was heard and he brandished a firearm, fired it into the counter, jumped over the counter, demanded money, and screamed "bitch, give me the money." The teller complied with his demand and he too grabbed money from her drawer. Defendant Chigawa further demanded the teller open a second drawer. Defendant Elawad approached and joined Chigawa in demanding money from the teller. They placed the money obtained into a pillow case.

8. Before he joined Chigawa, Defendant Elawad brandished a firearm and pointed it at a bank employee. He instructed her to "get down" and upon her compliance, he dragged her by the shirt from an office. The defendant continued to point the gun at her head and made statements to the effect, "don't make me kill you." Prior to leaving the bank, he returned to the employee and instructed her to remain calm.

9. Upon exiting the bank, a customer witnessed them exit with guns and money in a bag. The customer observed the defendants enter a Mazda Protege bearing Georgia license plate, 711 XWH. The defendants were followed by the customer who provided descriptions of them to law enforcement officials.

10. The identification of the vehicle was broadcast to local law enforcement authorities. Subsequently, the vehicle was located by Columbus Police Department officials at the Peachtree Mall in Columbus, Georgia. As they observed a vehicle meeting the description broadcast, four black males approached in a second vehicle, while two black males approached the broadcast vehicle from inside of the mall. The group of individuals exchanged greetings as they approached. The police officers approached and ordered them to the ground. At that time, the four males from the second vehicle immediately complied, however, the two males leaving the mall fired upon the officers. They avoided apprehension and an officer suffered serious bodily injury in the exchange of fire. The four males provided the officers with the names of Defendants Elawad and Chicagwa.

11. Further investigation of the vehicle revealed that it belonged to Samuel Taylor whose daughter, Heather, was the principal driver of the vehicle. Ms. Taylor informed investigators she gave Defendant Elawad permission to use her vehicle to transport his brother home. She said that he never returned with the vehicle. Photographs from the bank surveillance cameras were shown to Ms. Taylor and she positively identified Chigawa as the shorter of the two bank robbers. Defendant Elawad was later positively identified by a family member as the taller subject in the bank robbery.

12. Defendant Elawad was apprehended in the Northern District of Georgia on May 5, 2005, however, Chigawa was fatally wounded in the apprehension attempt. The weapons used in the robbery were found at the time of apprehension. The weapon used by Chigawa was a .38 caliber pistol and the weapon used by the defendant was a "BB" gun.

**Victim Impact**

13. Regions Bank lost approximately $10,848.50 as a result of the robbery and sustained $200 additional damage to the teller counter as a result of the discharged projectile. They recovered $9,251.84, leaving a balance of $1,596.66. This amount does not include the damages incurred from the discharge of the weapon.

14. Officer Mark D. Starling of the Columbus Police Department has a bullet lodged in his chest that is in an area to dangerous to operate, but does not hinder his vital organs at this time. The injury will be assessed every six months to determine the need to or not to operate. In addition, he sustained 16% partial disability of his left hand, arm, and shoulder.

**Adjustment for Obstruction of Justice**

15. We received no information to suggest that the defendant impeded or obstructed justice.

**Adjustment for Acceptance of Responsibility**

16. During our interview on February 8, 2006, the defendant openly acknowledged his involvement in the instant offense. He expressed his remorse for his actions and said he accepts full responsibility.

**Offense Level Computation**

17. The 2005 edition of the Guidelines Manual has been used in this case.

18. Pursuant to U.S.S.G. §§3D1.1(b)(1) and 5G1.2(a), any count for which the statute specifies a term of imprisonment to be imposed; and requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment shall be determined by that statute and imposed independently.

19. *Count 1 - Bank Robbery, 18 U.S.C. § 2113(a) and (d).*

20. **Base Offense Level:** The base level offense is 20. U.S.S.G. §2B3.1(a). **20**

21. **Specific Offense Characteristic:** Because the property of a financial institution was taken, and the taking of such property was an object of the offense, increase by 2 levels. U.S.S.G. §2B3.1(b)(1). **+2**

22. **Specific Offense Characteristic:** Because a threat of death was made, increase by 2 levels. U.S.S.G. §2B3.1(b)(2)(F). **+2**

23. **Specific Offense Characteristic:** Because a law enforcement sustained serious bodily injury, increase by 4 levels. U.S.S.G. §2B3.1(b)(3)(B). **+4**

24. **Specific Offense Characteristic:** Because the amount of loss exceeded $10,000, increase by 1 level. U.S.S.G. §2B3.1(b)(7). **+1**

25. **Victim Related Adjustments:** None. **0**

26. **Adjustment for Role in the Offense:** None. **0**

27. **Adjustment for Obstruction of Justice:** None. **0**

28. **Adjusted Offense Level (Subtotal):** **29**

29. **Adjustment for Acceptance of Responsibility:** As the defendant demonstrated an acceptance of responsibility for the offense of conviction, the adjusted offense level was decreased by two levels. U.S.S.G. §3E1.1(a). In addition, the defendant assisted authorities in the investigation/prosecution of the misconduct by timely notifying authorities of his intent to enter a plea of guilty and the government has filed a motion or indicated it intends to file a motion acknowledging the defendant's actions. As a result, the adjusted offense level was decreased by an additional one level. U.S.S.G. §3E1.1(b). **-3**

30. **Total Offense Level:** **26**

31. *Count 2 - Discharge of a Firearm during the Commission of a Crime of Violence and Aiding and Abetting. 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.*

32. Pursuant to U.S.S.G. §2K2.4(b), if the defendant, whether or not convicted of another crime, was convicted of violating 18 U.S.C. § 924(c), the guideline sentence is the minimum term of imprisonment required by statute, **10 years**.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

**Juvenile Adjudication(s)**

33. None.

**Adult Criminal Conviction(s)**

34. None.

35. The total of the criminal history score is 0, which establishes a criminal history category of I. U.S.S.G. Chapter 5, Part A.

**Other Arrests**

| | Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|---|
| 36. | 04/11/01 (age 13) | Petit Theft Escambia County, Florida Domestic Relations Court (2001 CJ 745A) | Escambia Sheriff's Department | **05/18/01:** No Petition Filed |

**Pending Charges**

37. The Columbus, Georgia Police Department has outstanding warrants on charges of Aggravated Assault on a Police Officer, **warrant #05012071**; Armed Robbery, Aggravated Assault, and Possession of a Firearm During a Crime, **warrant #0511511**.

## PART C. OFFENDER CHARACTERISTICS

**Personal and Family Data**

38. Malik Salman Elawad was born on February 26, 1985, in Sudan, Africa, to Salman Elawad and Mya Elawad (nee: Mai Moona). He is the fourth of five children born to this union. The defendant's parents maintain their residence at 3003 Thornberry Circle, Phenix City, Alabama.

39. The defendant said that he and his siblings were reared in the home with both parents. He reported that they resided in Africa the first five years of his life prior to entering the United States. He recalled that because of his father's involvement in the government, he went into asylum and came to the United States. He informed that they resided in Pensacola, Florida before relocating to Phenix City, Alabama. Defendant Elawad further recalled that there were no financial struggles during his childhood and that his parents always provided a stable environment. The defendant informed that his parents emphasized education as vital for their success in life. He said there were never any issues of abuse in the home. Defendant Elawad reported he lived in the home with his parents until approximately 1 month, prior to his arrest.

40. The defendant has never married nor has he fathered any children.

41. On March 3, 2006, we spoke with the defendant's father who verified his personal and family information. He indicated his son was always respectful in the home and was a very good student. Mr. Elawad said the defendant's behavior drastically changed after only three to four weeks into his acquaintance with the co-defendant. In addition, he stated that the defendant has never demonstrated this type of behavior and comes from a very close-knit family.

42. Defendant Elawad has four siblings, Hasan (26), Amen (24), Gamal (22), and Rayan (17) residing in Phenix City, Alabama.

**Physical Health**

43. The defendant is 6 feet, 1 inch tall and weighs 190 pounds. He has black hair and brown eyes. The defendant reported not having any identifying marks and none were visible. He said he is healthy and has no history of any serious health problems, but reported he has asthma. Defendant Elawad informed that he uses an inhaler.

**Mental and Emotional Health**

44. The defendant stated that he has experienced anxiety attacks and difficulty sleeping as a result of his incarceration. He reported he sought professional assistance through psychiatrist, Nancy Zach. We received a copy of the report prepared by Dr. Zach that the defendant was experiencing situational depression because of his current circumstances. It was indicated that he may have a history of being socially passive and possibly easily influenced. The defendant's attorney maintain a portion of the report regarding the instant offense.

**Substance Abuse**

45. The defendant reported that his substance use began at age 17, when he drank alcohol and smoked marijuana on a weekly basis. He said that his use of these substances continued over the next three years increasing gradually from occasional when he finished high school, to daily at the time of his arrest.

46. Defendant Elawad stated he experimented with Ecstacy on several occasions but has never used any other illicit substances.

47. The defendant expressed a need for assistance addressing his substance abuse.

**Educational and Vocational Skills**

48. Defendant Elawad reported that he attended Columbus State University, Columbus, Georgia from 2004 to 2005. We received verification that he attended from August 23, 2004, to February 28, 2005.

49. From 2002 to 2004, the defendant informed he attended Chattahoochee Valley Community College, Phenix City, Alabama. We verified that he attended from Fall 2002 to Summer 2004.

50. The defendant said that he graduated from Central High School, Phenix City, Alabama in 2003. The defendant's father verified this information but we had not received a response at the writing of this report.

**Employment Record**

51. At the time of the instant offense the defendant was unemployed. The defendant will be unemployed at sentencing.

52. The defendant reported that in 2004 he was employed by Quizno's on two separate occasions. He said he discontinued his employment because of the distance from his home. We verified through manager, Debbie Barley, that he was employed with them but she was not able to provide the exact dates.

53. Defendant Elawad informed that he was employed by Applebees, Columbus, Georgia for a short period of time 2004, however, he discontinued his employment to leave town. He stated he was earning $6.50 per hour. We spoke to a manager at the location that recalled the defendant but was not able to provide the exact dates of employment.

54. From 2003 to 2004, the defendant said that he was employed by McDonalds, Columbus, Georgia. He said that he was earning $5.15 per hour. We verified that he was employed from April 8, 2002, to May 2, 2003.

**Financial Condition: Ability to Pay**

55. The defendant reported not having any assets, liabilities, income, or monthly expenses. We obtained an Equifax credit report that revealed that the defendant does not have any credit history. In addition, we conducted a Westlaw database search that revealed no additional information. The defendant has court-appointed counsel. Based on his financial profile, he does not appear to have the ability to pay a fine within the applicable guideline range.

***In accordance with the recent ruling in United States v. Booker, 125 S.Ct. 738 (2005), where the Supreme Court ruled Federal Sentencing Guidelines are now advisory, it is the opinion of the U.S. Probation Office that the Court may sentence a defendant anywhere within the statutory provisions after considering 18 U.S.C. § 3553 when imposing a sentence.***

**PART D. SENTENCING OPTIONS**

**Custody**

56. **Statutory Provisions: Count 1:** The maximum term of imprisonment is 25 years for this Class B felony. 18 U.S.C. § 2113(a) and (d).

57. **Count 2:** The minimum term of imprisonment is 10 years for this Class C felony and shall run consecutively to the sentence in Count 1. 18 U.S.C. § 924(c)(1)(A)(iii).

58. **Guideline Provisions: Count 1:** Based on a total offense level of 26 and a criminal history category of I, the guideline range for imprisonment is **63 to 78 months**. U.S.S.G. Chapter 5, Part A.

59. **Guideline Provisions: Count 2:** The guideline term of imprisonment is the minimum term of imprisonment required by statute, **10 years.** U.S.S.G. §2K2.4(b).

**Impact of Plea Agreement**

60. Pursuant to a Rule 11(c)(1)(c) plea agreement, the government agreed to recommend a sentence at the low end of the applicable guideline range for Count 1, including the 10 years consecutive on Count 2. In addition, the government will recommend the sentence imposed run concurrently with any offenses the defendant is charged by the State of Georgia.

**Supervised Release**

61. **Statutory Provisions: Count 1:** If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than five years. 18 U.S.C. § 3583(b)(1).

62. **Count 2:** If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2).

63. **Guideline Provisions: Count 1:** The guideline range for a term of supervised release is at least three but not more than five years. U.S.S.G. §5D1.2(a)(1).

64. **Count 2:** The guideline range for a term of supervised release is at least two but not more than three years. U.S.S.G. §5D1.2(a)(2).

65. If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional. U.S.S.G. §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute. U.S.S.G. §5D1.1(a).

**Probation**

66. **Statutory Provisions: Count 1:** The defendant is not eligible for probation. 18 U.S.C. § 3561(a)(1).

67. **Count 2:** The defendant is not eligible for probation. 18 U.S.C. § 3561(a)(3).

68. **Guideline Provisions: Count 1:** Because the applicable guideline range is in *Zone D* of the Sentencing Table, the defendant is not eligible for probation. U.S.S.G. §5B1.1, comment. (n.2), and U.S.S.G. §5C1.1(f).

**Mandatory Drug Testing**

69. The Violent Crime Control and Law Enforcement Act of 1994 requires that an individual under supervision, whose offense occurred after September 13, 1994, shall refrain from the unlawful use of a controlled substance; shall submit to one drug test within fifteen days of the commencement of supervision; and shall submit to at least two additional periodic drug tests. The condition for mandatory drug testing may be ameliorated or suspended by the Court if reliable sentencing information indicates a low risk of future substance abuse by the defendant. 18 U.S.C. §§ 3563(a)(5) and 3583(d).

**DNA Requirement**

70. Pursuant to 42 U.S.C. section 14135a, for all felony offenses, the defendant shall submit to the collection and use of DNA identification information while incarcerated in the Bureau of Prisons, or at the direction of the U.S. Probation Office.

**Fines**

71. **Statutory Provisions: Counts 1and 2:** The maximum fine is $250,000. 18 U.S.C. § 3571(b)(3).

72. In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 U.S.C. § 3572(a)(6) and U.S.S.G. § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $1,876.61 for imprisonment, a monthly cost of $1,475.67 for community confinement, and a monthly cost of $283.23 for supervision.

73. A special assessment of $200 for Counts 1 and 2 is mandatory. 18 U.S.C. § 3013(a)(2)(A).

74. **Guideline Provisions: Counts 1and 2:** The consolidated fine range for the instant offense is from $15,000 to $150,000. U.S.S.G. §§5E1.2(c)(3) and 2K2.4(d)(1).

75. In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 U.S.C. § 3572(a)(6) and U.S.S.G. §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $1,933.80 for imprisonment, a monthly cost of $1,675.23 for community confinement, and a monthly cost of $287.73 for supervision.

**Restitution**

76. **Statutory Provisions:** Under 18 U.S.C. §3663A(a)(1) and (3), the Court shall enter an order for restitution. The Court shall order full restitution to the victim without consideration of the economic circumstances of the defendant. 18 U.S.C. §3664(f)(1)(A). The Court may order the defendant to make nominal periodic payments if the Court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution foreseeable future under any reasonable schedule of payments. 18 U.S.C. §3664(a)(3)(B).

77. Restitution in the amount of **$1,796.66** is owed by the defendant. The following financial institution is to be paid as follows:

Regions Financial Corporation
c/o Chris E. Hudgins
25 Washington Avenue, 1st Floor
Montgomery, Alabama 36104
**Case Number: 05-1423**

**PART E. FACTORS THAT MAY WARRANT DEPARTURE**

78. The Probation Office has neither identified nor received any information that would suggest a departure from the prescribed sentencing guidelines is warranted.

Respectfully submitted.

**JOSEPH T. NASH**
**CHIEF UNITED STATES PROBATION OFFICER**

By: /s/Jeffrey Lee
Jeffrey Lee
United States Probation Officer

APPROVED BY:

/s/R. Dwayne Spurlock RDS 3/15/06
R. Dwayne Spurlock Date
Supervising United States Probation Officer

TO: Natasha Silas, Attorney

FROM: Amelia Brooks

RE: Malik Elawad

DATE: May 9, 2005

During my senior year at Central High School, Malik was in one of my classes. We both were in the [illegible] one another often. Malik was always humble, caring , respectful, and very smart. He graduated within the top ten percent of our class in 2003.

I am very surprised to hear that Malik was involved in any crime.

If you have any questions, you may contact me at (334) 297-9937, my address is 1014 10th Ave. Phenix City, Al. 36867.

Sincerely,

Amelia Brooks



J.E. Crowe
1209 23rd Court
Phenix City, AL 36867

VIA: Fax (404) 688-0768

May 10, 2005

Natasha Silas,.Atty., or
To Whom It May Concern:

Re: Malik Elawad

I have known Dr. Salman Elawad (father of the captioned) for approximately three (3) years.

I met Dr. Elawad and most members of his immediate family (including Malik) while visiting people in the Christian ministry discussing the Bible and Bible prophecy.

With each visit to Dr. Elawad's home I have found him and his family to be respectful and conscientious people. They have always exhibited: mildness, respect, attentiveness to spiritual things, hospitality, and affection (just to mention a few of their good qualities).

Everyone that I have spoken with who knows Dr. Elawad and his family has nothing but good comments to make about him and his family.

Therefore, when I heard the news about Malik's involvement in crime, I was in total shock and disbelief!

It is my sincere hope that somehow it will be discovered that Malik was an unwilling participant in these events. Or, that he has come to his senses and is repentant for his wrongdoing.

If I may be of any help or answer any questions please give me a call or contact me by email.

Respectfully,

Jim Crowe

Jim Crowe
334-291-9595

May 10, 2005

Dorothy Jean Kinser
4417 Bridgewater Circle
Phenix City, AL 36867

To whom it may concern:

I have known of the Elawad family for almost 4 years.

As one of Jehovah's Witnesses, engaging in our door-to-door ministry, I met the first member of the family, Ayman, I think, on Sept. 11, 2001. From our brief conversation, I could tell he was brought up to be kind, courteous and hospitable, even to strangers.

As I called back to encourage them in a study of the Bible, I had occasion to meet Mrs. Elawad, each of their sons, and then in January of 2002, I met Dr. Elawad.

They have instilled in their children very good qualities, of which any parent would be proud.

Therefore, it was so uncharacteristic to hear of the involvement of Malik in such a situation as he is.

Any mercy that can be shown toward this young man would be appreciated by all that know this grieving family. I feel sure that Malik has come to know the truthfulness of the scripture at 1 Corinthians 15:33: "Bad associations spoil useful habits." Sincerely,

Jean Kinser

# MALAWI UPDATE

## Issue No 13

### April 1995

(return to main page)

Contents:

-- The Killing of General Manken Chigawa
-- From Contributors:
-- Reflections on the National Constitutional Conference by Prof A Peter Mutharika
-- A Church-to-Church Visit: Malawi - Scotland by Mr Gordon Landreth
-- In Brief
-- Notices

$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$

THE KILLING OF GENERAL MANKEN CHIGAWA

The Commander of the Malawian Army, General Manken Chigawa, was shot dead at Tsangano turnoff in Ntcheu District while travelling on the M1 from Zomba to Lilongwe on Wednesday evening 19th April around 7.00 pm Malawi time. He had just attended a high level security meeting in Blantyre. Gen Chigawa, 46, was appointed to the post of Commander in June of last year. As the country copes with the second loss in 11 months of its Army Chief, the debate in the press has centred on whether his death was an act of random violence or part of a planned coup by Army officers. It is an interwoven tale full of suspicion, rumour and unanswered questions, and exposing a new vulnerability in the country.

General Chigawa was travelling alone and had made a U-turn to stop and buy vegetables at the vendor stands. He left the car engine idling and as he was making his purchases, two men tried to steal the car. On confronting the men, the General was fatally shot. The crowd at the scene turned on one of the gunmen and beat him to death; the other managed to escape, taking with him the General's briefcase. One paper suggested that the dead man was shot by his accomplice and the crowd was trampling a dead body.

The Assailants. The papers first reported that the gunmen were Mozambican, based on papers found on the dead assailant, and the Mozambican Army had been asked to help apprehend the other gunman. The Monitor later identified the dead assailant as Malawian Justin Chigaga Sisirante from Chikwawa, based on his parents' identification of the body for the police. According to The Monitor, Sisirante was wanted in both Malawi and Mozambique on charges of illegal arms possession (two charges involving AK-47 assault rifles), murder and other offences. He apparently travelled under false identities and possibly obtained the false identity card of the Mozambican at a refugee camp where he had once hidden.



Several days following the shooting, the other gunman, identified as a Malawian named Kachepa Chibonga, was picked up in Machinga in the Central District. According to the press, he gave himself up and confessed his role in the murder. He was handed over by the Mwanza police to the Ntcheu police. The papers reported that while in transit and under armed escort, the prisoner, who was handcuffed, jumped from the open air police vehicle, in either a suicide or an escape attempt, and died. There are those who believe he was a death row prisoner used as a decoy and had no connection to the General's shooting.

The Democrat reported that the prisoner had been taken to his home to retrieve Chigawa's stolen briefcase, but the briefcase was not recovered. It is alleged to contain sensitive papers concerning future arrests of seven retired Army officers, including one General, for misappropriation of public funds.

The shooting of General Chigawa took place while President Muluzi was out of the country and on the eve of the 'Mwanza four' murder trial, causing some people to speculate that it might be linked to a coup attempt led by supporters of former President Banda and his henchman John Tembo.

Attempted coup or random violence? The day following the shooting five soldiers from Kamuzu barracks were arrested in what the Army first described as 'routine disciplinary matters.' A few days later, the Army acknowledged suspicions of a coup plot and called on citizens to help apprehend the alleged coup leader, Lt Col James C B Njoloma, who, according to the Army, went AWOL immediately after the killing of Gen Chigawa. Brown Mpinganjira, Minister of Information, announced that there had been a 'mutiny' plot but no coup plot. President Muluzi had said earlier that there was no coup plot and complained about 'speculative journalism'. Both the Army and the Government deny any link between the arrests of the five soldiers and the killing of General Chigawa.

According to The Democrat, Njoloma was already scheduled to face a court martial for 'inappropriate behaviour' whilst visiting a colleague in hospital, in the presence of an official party which included President Muluzi. Njoloma had said prayers for the man, who had been injured in a plane crash a few weeks earlier. This reportedly upset the President and his party. Njoloma was sent to Nsanje and while under surveillance allegedly disappeared after General Chigawa's killing. He remains at large.

The Democrat also reported that the Army suspects Njoloma of 'inciting lower rank officers and soldiers into subversive behaviour' and of socialising with the men of lower rank which is against Army regulations and exerting undue influence. There are rumours that Lt Col Njoloma had voiced opposition to Operation Bwezani, the Army's December 1993 security sweep in which members of the Malawi Young Pioneers, MYP, were disarmed and arrested. (The MYP served as an armed security force in the villages and townships, maintaining discipline and order and silencing critics of Banda's single party MCP (Malawi Congress Party) regime. It is said that Njoloma was particularly critical of the looting of MCP headquarters and of alleged violations of MYP members' human rights.

Army experts contend that the General's death could not have been

the work of trained soldiers. A military operation would have had three groups following the victim. The first would have alerted the 'target' group that the victim was in route, with a 'cut off' group ahead of the victim for a follow up attack should something go wrong. The fact that Chigawa made a U turn without incident proves this was not a professional, military attack.

President Muluzi, speaking at the burial ceremony of Gen Chigawa warned that should some people continue to abuse democracy to bring about lawlessness, his government would be forced to order another Operation Bwezani. Days later, on 30th April, Operation Cordon and Search took place in several townships in Blantyre. In a joint exercise, army and police using armoured trucks and vehicles, with helicopters overhead, searched homes and properties for illegal firearms. Several suspects were arrested and weapons seized, although precise numbers are not known at this time.

Democracy and Lawlessness. Whether Gen Chigawa's killing was part of a military plot or an act of random violence, this crime has tapped into a vein of anxiety in the country, a growing insecurity resulting from a growing crime rate.

Weapons are easily obtainable in Malawi, purchased cheaply from 'demobilised' soldiers in Mozambique. Armed robbery is said to be a common occurrence with more and more incidents occurring during daylight hours. The Police Inspector General's own home was burgled shortly before Gen Chigawa's murder, an incident the press has cited often since the killing as further proof of the IG's incompetence and the country's vulnerability to crime. It does not help that Malawi's police force do not patrol on 'beats' and are not trained to do so, and communities therefore are not systematically watched. Nor is the police force adequately equipped and funded to respond to emergency calls. It is often the case that there is no vehicle available or if there is, it lacks petrol.

Two opposition parties, the MCP and the newly formed Christian Democratic Party (CDP), have called for the IG's resignation and blame the UDF Government for the country's lawlessness. The Government, in a speech by Vice President Chihana a week before Gen Chigawa's death, voiced concern over 'armed efforts' aimed at national destabilisation, efforts some would claim are instigated by the MCP. From the time of his appointment, Gen Chigawa received anonymous letters containing threats against his life, although he had not received one in recent weeks.

There are those who believe that the perpetrators of Malawi's crimes are MYP who escaped Operation Bwezani and who remain in hiding in Mozambique under the protection of Renamo. The link between the former MCP government and Renamo is well known. With the mounting crime rate and its possible connection with the MYP, some believe the Army may well take matters into its own hands again, as it did in December 1993, rather than see the MCP/MYP regain power.

Equally worrying is the belief that certain middle-rank members of the Army are former MYP, intent on using the Army to wrest power away from the present UDF government. It is argued that Gen Chigawa, who along with most higher ranking officers advocated a non-political, non-partisan army, would have been a

natural target for this group.  The counter argument is that  Gen
Chigawa  was  determined  to restructure  the Army  and had  made
enemies in the middle-ranks by  the forced  retirement, based  on
political affiliations, of certain officers.

The paradox in all this is that while the new Malawi may have rid
itself of  its former  despots -- the MYP  and the  single-party
regime  -- it  is now  a nation  far more  vulnerable to  violent
crime,   a  different kind  of evil  which cannot  be so  easily
removed at the ballot box.

[This  report was based on information  supplied  by Article  19
and on articles from  Malawi newspapers,  including The  Monitor,
The Democrat, The Nation, The Daily Times,  The Weekly  Chronicle
and  The  Financial  Times,  which  were  provided  by  the  White
Fathers, Sutton Coldfield, UK.]

Posted on Thu, May. 05, 2005

# Family apologizes to wounded officer, asks son to surrender

Suspect phoned family Tuesday night but did not reveal his location

BY MELANIE BENNETT
Staff Writer

A man who is on the run after allegedly robbing a Phenix City bank and shooting a Columbus police lieutenant called his family Tuesday night, but he didn't say where he and his fellow suspect are hiding.

Malik Salman Elawad, 20, called his family in Columbus Tuesday night to get the telephone number of a friend in Atlanta, said his father, Salman Elawad, a biology professor at Chattahoochee Valley Community College in Phenix City.

The young man, a former HOPE scholarship recipient, didn't say where he was, and family members urged him to surrender to law enforcement agencies, the elder Elawad said Wednesday.

Malik Elawad and Morgan Chigawa, 25, are wanted in the Monday afternoon robbery at Regions Bank on U.S. 431 North in Phenix City. Police said after the two robbed the bank, firing a shot inside the building in the process, they fled to Peachtree Mall in Columbus, where they are accused of wounding Columbus Police Lt. Mark D. Starling in a shoot-out.

Starling, 50, a 28-year police veteran, was in stable condition at The Medical Center, said hospital spokeswoman Marion Scott.

Salman Elawad said Malik, the fifth of his six children, had never been in trouble until about two months ago, when he met Chigawa at Columbus State University.

Until recently, Chigawa lived at Fort Benning with a relative who is connected to the U.S. military, said Donnie Green, FBI agent-in-charge in the Columbus office. Chigawa's father, Gen. Manken Chigawa, was commander of the Malawian Army, and was killed in 1995.

After Malik Elawad met Chigawa, the younger man began to drink and smoke marijuana, Salman Elawad said.

"Malik, although we love him so much and he's such a dear child, he doesn't make good decisions," the father said. "We spent 20 years with this young man, and within six weeks someone destroyed this."

The Elawad family is cooperating with authorities in the hope that the two suspects will surrender peacefully, Salman Elawad said.

### Father calls officer

Salman Elawad was educated in the United States and moved from the Sudan in East Africa to Pensacola, Fla., in 1989. He said he has talked with Starling on the phone, and Elawad and his wife hope to be able to visit the wounded police officer today.

"I called him in the hospital, told him I'm really sorry about what happened to him," Elawad said. "I just thanked him for doing his duty."

The FBI has offered a $10,000 reward leading to the arrest and conviction of Elawad and Chigawa.



The Regions Bank was robbed about 4:30 p.m. Monday. Just after 6 p.m., Columbus police found the unoccupied 2002 Mazda 626 the suspected robbers were driving at the mall parking lot.

Officers formed a perimeter around the car, hoping to catch the two men when they returned to the vehicle, Columbus Police Chief Ricky Boren said. As Elawad and Chigawa came out of the mall and toward the car, the two men started talking to four men who were traveling in a Dodge Durango.

Police made the decision to try to catch the suspects as the six men walked toward the mall, Boren said. Starling, who was behind his Ford Taurus, ordered the men to the ground. Chigawa fired shots toward Starling, hitting the detectives three times. Three Columbus officers returned fire, but police do not know if the robbery suspects were hit.

The four men from the Durango were not involved in the robbery or the shooting, Boren said. They were detained and questioned, but later released without charges.

Starling was shot in the left wrist, the left arm between the elbow and the shoulder, and the top of his left shoulder. The shot to his shoulder traveled into his chest, Boren said.

John Lester, director of public relations at Columbus State University, said Chigawa is currently enrolled at CSU as a management major. Elawad, who has an associate's degree from CVCC, was enrolled at CSU only during the fall semester, and was a biology major, Lester said.

Salman Elawad said his family was not aware until recently that his son had dropped out of school. He said the 20-year-old had quit two jobs in the last few weeks, including a job at Applebee's. The young man quit the job so he could go on a spring break trip to Florida.

"He went, spent all his paycheck and had a good time," Salman Elawad said. He said his son led the family to believe that he had cleared the vacation with his employer. It was only when the young man got back and was not going to work that the family found out Malik Elawad had quit his job.

"I got upset, his mother got upset," Salman Elawad said. In the past few weeks, the father said he stopped giving money to his son after he realized his son was using the cash to buy marijuana.

"One time I said, 'Son, we love you so much. If this drug you are using is taking you over, we will go to a doctor.' "

A few weeks ago, his son decided to move in with Chigawa at a house off Macon Road, Salman Elawad said.

**Brother tells of plot**

After the Monday night shooting, FBI agents and police officers came to the Elawad family's house on Barbara Road. After the officers left, one of Malik Elawad's older brothers confided to the father that Chigawa had recently hinted at plans for quick money.

The older son said he took Malik Elawad to Chigawa's house, and Chigawa showed him two guns and some ammunition.

"He said, 'I'm going to do something big and I'm going to get a lot of money,' " Salman Elawad said. "He said, 'If you want to do it with me, I will share the money.' "

The family called the FBI Monday night and told agents about the conversation.

Salman Elawad said he wants his son to surrender to law enforcement officers before anyone else gets hurt.

Salman Elawad said he believes Chigawa is influencing and perhaps forcing Malik to flee

"He is young," Salman Elawad said of his son. "It is very overwhelming to him. I don't think he has the mental ability to handle this. I think Malik is a victim, and that he was not doing what he really wanted to do... . He was forced to do it."

The ordeal has taught the 60-year-old professor a valuable lesson.

"I'm going to devote the rest of my life to helping young people not get into such situations," Salman Elawad said. "I teach young people. Now my own son needs help, and I cannot help him. Someone put him in this bad situation."

*Contact Melanie Bennett at (706) 576-6284 or mbennett@ledger-enquirer.com*

Malik as a 6 month baby





DEFENDANT'S
EXHIBIT
20



Young Malik with his brother and friends in Africa

Malik is pictured at the bottom right corner of photo



DEFENDANT'S
EXHIBIT
21

at approximately age 7.

DEFENDANT'S EXHIBIT 22

SOCCER

WOLVES
1995



DEFENDANT'S
EXHIBIT
23



Malik at age 14 with fellow team members of the Marcus Point Baptist Church "Staying Inbound" League

Malik with his brothers
Aymen
Malik
Hassan
Gamal
Rayyan
DEFENDANT'S
EXHIBIT
25

Malik at age 18
Central High School
Graduation Photo

113 92721 CPC SR FORMAL 90



DEFENDANT'S
EXHIBIT
26





DEFENDANT'S
EXHIBIT
27