IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | CASE NO:3:05-CR-121-MHT |
| ) | |
| MALIK ELAWAD ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF SENTENCING POSITION**

**COMES NOW** the Defendant, Malik Salman Elawad ("Mr. Elawad") by and through undersigned counsel, and respectfully submits the following in support of his sentencing position that the appropriate and reasonable sentence to be imposed is a total sentence of no greater than fourteen years. Mr. Elawad is before the Court for sentencing on a plea of guilty to one count of bank robbery pursuant to 18 U.S.C. §§2113(a) and (d) and one count of use of a firearm during a crime of violence pursuant to 18 U.S.C. §924(c)(1)(A)(iii).

In support of this memorandum, the defendant would show:

**Offense**

From the outset, Mr. Elawad fully has accepted responsibility for his behavior and repeatedly expressed remorse for his conduct, poor judgment, and the pain and anguish caused to his family by this offense. Mr. Elawad's family fully cooperated with the Federal Bureau of Investigation ("FBI") to apprehend Malik Elawad. (Exh19, Ledger-Enquirer Newspaper Article entitled, "Family apologizes to wounded officer, asks son to surrender" dated May 5, 2005.)

Both Mr. Elawad's father and brother called the FBI to relay information that they had regarding what they knew of a plan to get money that was vaguely alluded to by Mr. Chigawa. (Exh 19). According to Mr. Elawad, he feared being killed by police and wanted to surrender peacefully.

However, he knew that Mr. Chigawa would not allow him to do so. As a result, Mr. Elawad called his home, prior to his apprehension, in a secret attempt to notify his parents of his location. During that call, Dr. Elawad urged his son to surrender to law enforcement. (Exh 19). Immediately after the Elawad family learned that Mr. Chigawa had injured a police officer during the commission of the instant offense, the Elawad family personally visited the wounded officer, apologized for what had happened to him, and thanked the officer for performing his duty. (Exh 19). Further, the Elawad family visited the wounded officer while he was recovering in the hospital.

## Plea Agreement

On February 6, 2006, a plea agreement was filed in this case. (D.E.. 23; Exh 1. *Plea Agreement Filed on February 6, 2006)*.[1] Pursuant to that agreement, Mr. Elawad pled guilty to counts one and two of the indictment. In this agreement, Mr. Elawad agreed to the imposition of six level enhancements: a two level enhancement pursuant to United States Sentencing Guidelines ("U.S.S.G.") §2B3.1(b)(1), for property taken from a financial institution, and a four level enhancement pursuant to U.S.S.G.§2B3.1(b)(3)(B), for his accomplice injuring a police officer.

In exchange for Mr. Elawad's plea of guilty and acceptance of the offense level enhancements, the government agreed to a two level reduction in the applicable offense level for acceptance of responsibility and a two level reduction for Mr. Elawad's minor role in the instant

---

[1] On October 3, 2006, Mr. Elawad filed twenty-seven (27) exhibits with this Court in support of his sentencing position in a document titled, *Notice of Exhibits*. (D.E. 39). On January 9, 2007, Mr. Elawad filed exhibit number twenty-eight, an affidavit from Osman Fadl, in support of his sentencing position. Those filings contained a "Table of Exhibits" in which a number and description for each exhibit was provided. In the interest of convenience for this Court in the reading of the instant memorandum, each of the exhibits referred to in this memorandum have the same exhibit number and contain the same description as previously provided in Mr. Elawad's *Notice of Exhibits*. However, as all twenty-eight exhibits have already been filed, they are not being filed again as an attachment to this sentencing memorandum.

offense, pursuant to U.S.S.G. §§3E1.1(a) and 3B1.2(b) respectively. Because Mr. Elawad assisted law enforcement, the Pre-sentence Report in this case indicates that an additional one level reduction would be made to the offense level, resulting in a total three level reduction for acceptance of responsibility. The government further agreed that no enhancements under U.S.S.G.§2B3.1(b)(2)(A) were applicable in this case because a sentence will be imposed for the discharge of a firearm pursuant to 18 U.S. C. §924 (c)(1)(A)(iii) and that no cross-referencing to U.S.S.G.§1B1.5 was applicable.

In the plea agreement, the government acknowledges that Mr. Elawad never fired any weapon and that he should be sentenced at the low end of the applicable guideline range. As Mr. Elawad is in criminal history Category I and his offense level for count one is 22, pursuant to the Plea Agreement, the applicable guideline range in this case is between forty-one and fifty-one months. The plea agreement does not limit any defense motions for downward departure and Mr. Elawad has preserved his right to file a direct appeal of an upward departure from the applicable guideline range.

*United States v. Booker*, 542 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), struck down the provisions that rendered the Federal Sentencing Guidelines mandatory. Thus, those Guidelines are merely advisory and should be considered as such in the sentencing of Mr. Elawad.

"Although the district courts are no longer required to apply the range dictated by the Sentencing Guidelines, they are still obligated to consult those Guidelines and take them into account when sentencing."*United States v. Gibson*, 434 F.3d 1234, 1243 (11th Cir. 2006)(citing *Booker*, 125 S.Ct. at 767.). Further, Mr. Elawad agreed in the plea agreement to the applicability of the Sentencing Guidelines. (D.E. 23; Exh 1. *Plea Agreement Filed on February 6, 2006*, p. 5).

U.S.S.G. §1B1.4, entitled "Information to be Used in Imposing Sentence (Selecting a Point

within the Guideline Range or Departing from the Guidelines)," instructs this Court that "[i]n determining the sentencing to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by the law. See 18 U.S.C.§3661."

18 U.S.C.§3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

In this case, consideration of Mr. Elawad's background, character, and conduct support a finding that the total sentence of fourteen years is reasonable.

"After [a] district court has calculated correctly the defendant's Guideline range, it 'may impose a more severe or more lenient sentence' that [is] review[ed] for reasonableness." *United States v. Winingear*, 422 F.3d 1241, 1244 (11th Cir. 2005)(quoting *United States v.Crawford*, 407 F.3d 1174, 1179 (11th Cir. 2005)). 18 U.S.C.§3553(a) provides:

> (a) Factors to be considered in imposing a sentence.-- The court shall impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>     (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>     (2) the need for the sentence imposed –
>         (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>         (B) to afford adequate deterrence to criminal conduct;
>         ( C ) to protect the public from further crimes of the defendant; and
>         (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>     (3) the kinds of sentences available;
>     (4) the kinds of sentence and the sentencing range established for –

>                                   \*\*\*
> (5) any pertinent policy statement –
>                                   \*\*\*
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense. (emphasis added).

As the sentencing guidelines are no longer mandatory, "judges [are] to take account of the [g]uidelines together with other sentencing goals." *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005)(citing 18 U.S.C.A. §3553(a)(Supp.2004)). "In sum, in every case, a court must now consider *all* of the §3553(a) factors, not just the guidelines." *United States v. Ranum*, 353 F.Supp.2d 984, 986 (E.D. Wis. 2005)(emphasis in original)."[C]ourts are free to disagree, in individual cases in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the §3553(a) factors." *United States v. Rodriguez*, 406 F.3d 1261, 1288 (11th Cir. 2005)(citing *Ranum*, 353 F.Supp.2d at 987).

### **Malik Elawad's Family Background**

Mr. Elawad was born on February 26, 1985 in Sudan, Africa to Dr. Salman Elawad ("Dr. Elawad") and Mrs. Maimoona Elawad ("Mrs. Elawad"). (Exh. 2, *Photograph of Dr. & Mrs. Salaman & Maimoona Elawad*).

Dr. Elawad is a college biology professor. He has been teaching biology for several years. He began teaching biology at the University of Khartoum, located in Sudan, Africa. Dr. Elawad received a doctorate degree in biology from the University of West Florida in 1981 as a part of a Sudanese government-sponsored program that sent its educators to America to receive advanced degrees.

In 1989, a military coup of the democratically elected Sudanese government was orchestrated by Omar Hassan Ahmad al-Bashir ("Bashir"). (Exh 3, *Wikipedia, Internet Encyclopedia Article re: Omar Hassan Ahmad al-Bashir*). Bashir fueled an existing civil war between the northern and southern portions of the Sudan by sending military troops into the southern region of the country to drive out all non-Arab men, women, and children via torture, rape, slaughter, and the burning of villages. (Exh 3). When Mr. Elawad was approximately five years old, he and his family fled to the United States subsequent to his father being imprisoned along with other intellectuals as a result of Bashir's rise to power. (D.E. 36, *Forensic Expert Report by Dr. Marianne Rosenzweig*).[2] Under threats of political imprisonment and death, the Elawad family sought asylum in the United States in 1990.

Upon arriving in the United States, the Elawad family settled in Pensacola, Florida. There, Dr. Elawad obtained employment as a biology professor at the University of West Florida.

After the Elawad family reached the United States, Dr. Elwad taught biology at the University of West Florida. He has been a biology professor at Chattahoochee Valley Community College ("CVCC"), located in Phenix City, Alabama, for six years.

Mr. Elawad's mother obtained a bachelors degree in mathematics from the University of Khartoum. She has also obtained an associates degree in mathematics from Pensacola Junior College. She currently works full time as a health care worker in Phenix City, Alabama for Direct Service Home Net Corp.

---

[2] The Forensic Report by Dr. Marianne Rosenzweig was separately filed under seal with this Court on October 3, 2006. It was not made a part of Mr. Elawad's *Notice of Exhibits*, also filed on October 3, 2006.

Mr. Elawad turned twenty-one (21) years old on February 26, 2006. He is the fourth of five children born to Dr. And Mrs. Elawad. The other four children are his brothers: Hassan, Aymen, Gamal, and Rayyan.

Hassan, Aymen, and Gamal are each full time college students. Each of them are scheduled to graduate from college in May of this year. Hassan and Aymen will receive masters degrees from Columbus State University ("CSU") in computer information systems and computer engineering respectively. Gamal will receive a bachelors degree in medical biology. Gamal will be attending medical school in Dahlonega, Georgia this fall. Rayyan, is currently a straight "A" student at Central High School, and he also takes college classes through the high school's college preparation program.

As a young boy, Mr. Elawad was active in and excelled at school sports, such as soccer and basketball. He received several awards and trophies for his participation in these sports. (Exh 5, *Photograph of Soccer Trophies received by Mr. Elawad Between 1992 and 1995*). In 1999 and 2000, he received awards for his participation with the Marcus Point Baptist Church "Stay In Bounds" basketball league and in 2001, Mr. Elawad received an award for his participation on the Wm. J. Woodham High School Junior Varsity Basketball league. (Exh 6, *Photograph of Marcus Point Baptist Church and Woodham High School Basketball Trophies from 1999 to 2001*).

Mr. Elawad also excelled academically. While attending both Workman Middle School and Booker T. Washington High School, he received awards for his school work and for the outstanding character and leadership he exhibited in the various organizations of which he was a member. (Exh 7, *Workman Middle School Certificate for Excellence in Keyboarding, awarded on May 21, 1998*; Exh 8, *Booker T. Washington High School National Beta Club Certificate awarded in May of 2000*

*and* Exh 9, *Secretary of Navy Scholastic Leadership Award* ). While attending Wm J. Woodham High School, he maintained an "A" grade point average of 3.8750, just .125 points below a perfect 4.0 gpa. (Exh 10, *Wm J. Woodham High School Grades Transcript*).

Following the Elawad family's relocation to Phenix City, Alabama in 2001, Mr. Elawad was enrolled at Central High School where he continued his academic success. He was awarded "Sports Medicine Student of the Year" for the 2001-2002 school year. (Exh 11, *Photograph of "Sports Medicine Student of the Year" Award; Science and Math Club Trophy*). In 2002, he received an award for placing first in a Science and Math Club basketball tournament. (Exh 11). Also in 2002, Mr. Elawad placed first in a Health Occupations Students of America Dental Spelling Contest. (Exh 12, *Health Occupations Students of America Certificate Awarded on December 18, 2002*).

As a result of Mr. Elawad's successful passage of both honors courses and the college courses he took as a part of his high school's college preparation program, on May 23, 2003, Mr. Elawad graduated from Central High School with an advanced technical diploma. (Exh 13, *Central High School Advanced Technical Diploma, awarded on May 23, 2003*).

Following his high school graduation, Mr. Elawad attended Chattahoochee Valley Community College ("CVCC") until the summer of 2004. (Exh 14, *Chattahoochee Valley Community College Grade Transcript*). There, Mr. Elawad maintained an above average grade point of 3.056 and earned enough credits to receive an associates degree in one year.

Thereafter, Mr. Elawad transferred his CVCC credits and enrolled at Columbus State University ("CSU") in Columbus, Georgia, in the fall of 2004. At that time, Mr. Elawad intended to pursue a bachelor's degree in biology. In approximately April of 2005, just prior to start of Mr. Elawad's erratic criminal behavior in May, he dropped out of school at CSU, unbeknownst to his

family and friends.

### Malik Elawad's Character

As reflected in the Pre-sentence Report ("PSR"), Mr. Elawad was arrested on petty theft charges when he was thirteen years old, of which no criminal proceedings ever resulted. (Exh15, *Pre-sentence Report prepared on March 15, 2006, p.6-7*). The PSR accurately reflects that Mr. Elawad has no prior criminal record. (Exh 15, *p. 6*). Nothing in Mr. Elawad's character or behavior foreshadowed his involvement in the instant offense.

Because of the outstanding conduct that Mr. Elawad had consistently exhibited, both his family and friends were shocked to learn of his involvement criminal activity. In fact, when the initial stages of this case were being handled by Natasha Silas, Esq. ("Ms. Silas"), an Associate Federal Defender in Atlanta, Georgia, friends close to the Elawad family wrote Ms. Silas in a show of support. All of those letters express "surprise" and "total shock and disbelief" that Mr. Elawad was involved in any kind of criminal activity. (Exh 16, *Character Letters Written in Support of Mr. Elawad, dated May 9 and 10 of 2005*).

Just prior to the commission of the offense, Mr. Elawad began to spend a great deal of time with Morgan Chigawa ("Mr. Chigawa"). Mr. Chigawa had a violent and tragic past. He and his brother, Manken Chigawa, came to the United States from Malawi, Africa, following the assassination of both of their parents. Mr. Chigawa's parents were targeted as a part of a military coup due to Mr. Chigawa's father's position as a Commander of the Malawian Army. (Exh 17, *Malawi Update, Issue No 13, dated April 1995*).

After his arrival to the United States, Mr. Chigawa bragged to Mr. Elawad about past fist fights he had been involved in and about his having shot and killed a man at a Malawian night club.

9

Mr. Chigawa stated his dissatisfaction over the fact that he no longer lived the opulent lifestyle that he had become accustomed to in Malawi as the son of a high ranking military official. Due to his unhappiness with not having a lot of money at his disposal, Mr. Chigawa planned and executed the bank robbery. Mr. Chigawa supplied the firearms used in the bank robbery and he planned the get-away from the robbery location. Mr. Chigawa would have been charged in the indictment, but he was killed by police officers while being apprehended for the bank robbery.

While spending time with Mr. Chigawa, Mr. Elawad also began to drink alcohol heavily and smoke marijuana on a daily basis. This heavy drug and alcohol abuse clouded Mr. Elawad's judgment and significantly contributed to his becoming involved in behavior that was the total antitheses to his otherwise law abiding life.

Since Mr. Elawad's incarceration, he has acknowledged that he does have a substance abuse problem and is in need of assistance. On October 28, 2005, Dr. Nancy Sack ("Dr. Sack") evaluated Mr. Elawad's mental health. During that evaluation, Mr. Elawad admitted that he had been unable to stop using marijuana although he knew he needed to discontinue its use. (Exh18, *Psychological Evaluation, dated October 28, 2005, p. 2*).[3]

In addition to Mr. Elawad's acknowledgment that he needed substance abuse help, Dr. Sack documented that Mr. Elawad was having reoccurring nightmares since his incarceration and that he was suffering from situational depression. (Exh 18, *p. 3-4*).

After learning of Mr. Elawad's depression, undersigned counsel arranged to have Mr. Elawad re-evaluated by forensic and clinical psychologist Marianne Rosenzweig, Ph.D ("Dr. Rosenzweig").

---

[3] Due to the sensitive and confidential information obtained in Dr. Sack's Evaluation, Exhibit 16 was filed under seal on January 3, 2007. A redacted copy has previously been provided to the Probation Officer who prepared the Presentence Report.

Dr. Rosenzweig's Forensic Expert Report, dated May 26, 2006, was filed under seal with this Court on October 3, 2006. (D.E. 36).

Dr. Rosenzweig's report documents that due to economic difficulties, the Elawad family moved between five and six times in a ten year period. (D.E. 36, p.2). When the Elawad family moved to Phenix City, Alabama, Mr. Elawad was approximately fifteen or sixteen years old. Mr. Elawad found the move distressing because he had to leave all of his friends, resulting in heightened feelings of alienation. (D.E. 36, p.2).

Dr. Rosenzweig's report documents that Mr. Elawad was sexually molested on two separate occasions when he was a young boy. (D.E. 36, p.2). The first incident of sexual abuse occurred when Mr. Elawad was between five and six years old. In this instance a twelve year old neighbor boy forced Mr. Elawad to perform oral sex on him and in turn, the neighbor boy performed oral sex on Mr. Elawad. (D.E. 36, p.2). The second incident of sexual abuse occurred when Mr. Elawad was eleven years old. In this instance, Mr. Elawad was grabbed and fondled by an adult male stranger on the street while Mr. Elawad was staying in the Sudan on a family vacation. (D.E. 36, p.2).

These occurrences of abuse caused Mr. Elawad to worry that he was attracting homosexual advances. (D.E. 36, p.2). These incidences of sexual molestation further made him question his masculinity and passivity. As a result, Mr. Elawad felt he had to "prove" his masculinity by drinking alcohol and smoking marijuana when interacting with other males. (D.E. 36, p.3).

Dr. Rosenzweig's report documents that Mr. Elawad first met Morgan Chigawa ("Mr. Chigawa") in the fall of 2004. (D.E. 36, p.4). Mr. Elawad moved into an apartment with Mr. Chigawa and another male friend around February of 2004. (D.E. 36, p.4). Mr. Chigawa drank alcohol continuously and prepared multiple marijuana cigarettes laced with cocaine, of which Mr.

11

Elawad would smoke two to three daily. (D.E. 36, p.4). For the first time Mr. Elawad used ecstasy, and PCP on several occasions. (D.E. 36, p.4). Malik reported to Dr. Rosenzweig that a week prior to the robbery, his drug abuse had greatly increased and impaired his mental state.(D.E. 36, p.4). Malik further reported that immediately prior to the commission of the robbery, he drank alcohol and smoked a marijuana cigarette laced with cocaine. (D.E. 36, p.4).

     Dr. Rosenzweig's report documents that Mr. Elawad had become alarmed and fearful of the high degree of possessiveness and aggression that Mr. Chigawa had been demonstrating towards him. (D.E. 36, p. 4). In particular, Mr. Chigawa was controlling and often made decisions for Mr. Elawad without consulting him first. (D.E. 36, p. 4). Additionally, Mr. Chigawa had taken on a persona of invincibility and always kept a loaded firearm on his person.(D.E. 36, p. 4). Thus, despite wanting to flee from Mr. Chigawa, Mr. Elawad's fear of Mr. Chigawa kept him from doing so. (D.E. 36, p. 4).

     Mr. Elawad reported to Dr. Rosenzweig that he was afraid of being shot and killed by Mr. Chigawa if he refused to participate in the robbery that Mr. Chigawa had planned.(D.E. 36, p. 5). Mr. Elawad was also afraid of being shot if he attempted to flee from Mr. Chigawa at any time while they were eluding the police after the commission of the robbery. (D.E. 36, p. 5).

     The results of the Personality Assessment Inventory ("PAI") examination administered by Dr. Rosenzweig revealed, in part, that Mr. Elawad was depressed. (D.E. 36, p. 7). The incidences of past sexual abuse and the bank robbery had continued to remain a source of great distress for him.(D.E. 36, p. 7). Dr. Rosenzweig opines in her report:

> It is likely that Malik's preoccupation with the molestations was a factor that contributed to the onset of what appears to have been an episode of clinical depression in his junior year of high school. The depression in turn seems to have been the triggering event for his abuse of marijuana, which he used in a self-

medicating fashion. . . .With respect to his involvement in the bank robbery, Malik's account of having done so only because he felt intimidated and fearful of Morgan is believable given his history and the test results. Furthermore, Morgan's [referring to Mr. Chigawa] actions during the two shootouts with the police attest to the validity of Malik's perceptions in the days prior to the robbery that Morgan was a dangerous man capable of causing serious harm to others, including Malik. It is also very likely that Malik's thinking was highly clouded as a result of his abuse of substances, and thus his ability to generate solutions to the problem of dealing with Morgan's intimidation of him was probably grossly impaired. (D.E. 36, p. 8).

In addition to Mr. Elawad's fear of Mr. Chigawa, Mr. Elawad's Sudanese culture may have further influenced his inability to flee from Mr. Chigawa. Osman Fadl ("Mr. Fadl"), an expert in Sudanese culture, stated in an affidavit that the Sudanese people abide by a strict code of friendship that requires individuals to remain friends, even when one friend may be engaging in unsavory conduct. (D.E. 44; Exh 28, Osman Fadl Affidavit, p. 2).[4] The Sudanese people have an ingrained reverence for elders. (D.E. 44; Exh 28, p.2). The Sudanese believe that an elder is anyone older than oneself. (D.E. 44; Exh 28, p.2). "It is a common saying in the Sudanese culture that 'If someone is older than you by one day, they are more knowledgeable than you by one year.' Thus, you must respect someone who is older than you." (D.E. 44; Exh 28, p.2). Mr. Chigawa was approximately 4 years older than Malik at the time of the offense.

Because of the great importance placed on belonging to a group of friends with whom you have things in common,"when a person from the Sudan comes to the United States and initially cannot find friends or other individuals with whom he can share the same cultural experiences, that person becomes open to being influenced by a group where he can find acceptance."(D.E. 44; Exh 28, p.2).

---

[4] The Osman Fadl Affidavit was separately filed as exhibit number twenty eight on January 9, 2007.

Dr. Rosenzweig's report documents the following:

In the fall of 2004, Malik [,then age nineteen] first met the other perpetrator in the bank robbery, Morgan Chigawa, when he transferred to Columbus State University where Morgan was also a student. However, he did not really get to know Morgan until the spring semester of 2005. Morgan told him he was 22 years old (after his arrest, he learned Morgan was 25), and had moved to the U.S. from Malawi, Africa at age 16-17 after his parents had been assassinated in a military coup. Malik liked Morgan as he reports that he was always smiling, and he felt that they had a number of things in common - their African birth and upbringing, an interest in sports and physical fitness, and a penchant for partying with alcohol and marijuana.(D.E. 36, p. 4).

## **Malik Elawad's Minor Role in the Instant Offense**

A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal."

"When determining whether a minor-role reduction is warranted, a district court should consider (1) whether the defendant played a minor role in relation to the relevant conduct for which he was held accountable and (2) where appropriate, the culpability of the defendant as measured against that of other participants in the relevant conduct.

*United States v. Abrams*, 2006 WL 690850 at *13 (11th Circuit 2006)(citing *United States v. DeVaron,* 175 F.3d 930, 944 (11th Cir. 1999)).

Mr. Elawad did not initiate the idea of committing a robbery. He did not procure the firearms used by Mr. Chigawa during the robbery. He personally carried an unloaded BB gun. Mr. Elawad did not plan the bank robbery or the escape. Mr. Chigawa tried to elude capture by police by obscuring the get-away car license plate with tape. This offense was orchestrated by Mr. Chigawa.

While Mr. Elawad will be sentenced under 18 U.S.C. §924(c)(1)(A)(iii) for use of a firearm during a crime of violence, all of the evidence shows that at no time during either robbery or the escape did Mr. Elawad personally discharge any firearm. The government agrees that Mr. Elawad never fired any weapon. The government agrees that Mr. Chigawa was solely responsible for firing at and injuring law a police officer during the commission of the instant offense. (D.E.1, *p. 4-5*). Mr.

Elawad never carried a loaded firearm at any time during the instant offense.

When Mr. Elawad's relevant conduct is measured against that of Mr. Chigawa's conduct, it becomes apparent that Mr. Elawad played a minor role in the offense of conviction.

### Basis For Downward Departure

"Departures under section §5K2.0 are 'reserved for 'unusual' cases where there is something atypical about the defendant **or** the circumstances surrounding the commission of the crime which significantly differ from the normal or 'heartland' conduct in the commission of the crime.'" *United States v. Onofre-Segarra*, 126 F.3d 1308, 1310 (11th Cir 1997) (citing *United States v. Gonzalez-Lopez*, 911 F.2d 542, 549 (11th Cir. 1990)(emphasis added).

§5K2.0 ( C ) permits departures based on multiple circumstances even if one such circumstance would not ordinarily be relevant to a determination of whether a departure is warranted. Mr. Elawad's involvement in this crime was atypical behavior for him. Mr. Elawad has no prior criminal record. Mr. Elwad was an exceptional college student who had done extremely well academically. He had a history of receiving accolades and awards for his participation in sports and school activities, and he had earned the respect of his family and community for his overall scholastic aptitude. His family members were and are supportive and committed to the pursuit of education and a law abiding life.

A sentencing departure is also warranted in this case due to the high probability that, as a first time offender, Mr. Elawad may be subjected to the assaults and rape that commonly occur in federal prisons. As mentioned *supra*, Mr. Elawad just recently turned twenty-one years old. Mr. Elawad has a very youthful appearance. As this is his first offense and he has no prior history of incarceration, absent his current confinement at the Montgomery City Jail, Mr. Elawad is totally unfamiliar with

the dangerous realities of federal prison culture. "Indeed, brutal assault and homosexual rape are facts of daily life in men's prisons." Majorie Rifkin, *Farmer v. Brennan: Spotlight on an Obvious Risk of Rape in a Hidden World*, 26 Colum.Hum.Rts.L.Rev. 273, 277 (1995).

> Justice Blackmun, concurring in *Farmer*, recognized the terrors encountered by. . . prisoners who are at the mercy of larger, stronger, and ruthless inmates. In an earlier opinion, he noted that "(a) youthful inmate can expect to be subjected to homosexual gang rape his first night in jail, or . . . even in the van on the way to jail." *Id*. (citing *Farmer v. Brennan,* 511 U.S. 825, 853 (1994)).

"Judges and juries from nearly every circuit routinely hear grisly evidence of prisoner violence." *Id.* "Homosexual rape or other violence among prison inmates serves absolutely no penological purpose." *Farmer*, 511 U.S. at 852. "Such brutality is the equivalent of torture, and is offensive to any modern standard of human brutality."*Id.* (citation omitted).

Additionally, although it may appear that Mr. Elawad's lack of criminal history has already been considered by the guidelines due to the fact that he is in a Category I for criminal history, the sentencing guidelines do not differentiate between an individual such as Mr. Elawad who has no prior criminal history and the individual who has a very limited criminal history that would also allow for a criminal history of Category I. Particularly, when viewed in the aggregate, all of the above combine to create a situation that takes Mr. Elawad's case out of the "heartland" of cases governed by the sentencing guidelines, warranting a departure pursuant to U.S.S.G.§5K2.0.

**Standards for a "Reasonable"Sentence**

This Court must also assess what constitutes a reasonable sentence and meets the sentencing objectives identified in 18 U.S.C. §3553(a). At all times prior to the instant offense, Mr. Elawad lived a law abiding life and appeared to have respect for rules and authority. Such a conclusion can reasonably be drawn based on Mr. Elawad's lack of previous criminal history and his background.

In addition, the nature and circumstances of this case establish that Mr. Elawad played a minor role in the offense of conviction because he did not orchestrate this offense, he did not carry a loaded firearm, and he did not discharge any firearm at any time during the commission of the offense.

Sentencing Mr. Elawad to a term of imprisonment that is greater than fourteen years will not only punish him based on the seriousness of the offense and respect for the law, but it will also provide a more than adequate deterrence to any further criminal conduct by an individual who, at all times prior to this offense, appeared to lack any propensity toward criminal behavior. Based on Mr. Elawad's behavior prior to the offense of conviction, it is reasonable to conclude that he was well on his way to being a productive member of society. The likelihood of recidivism in his case is very low. Thus, a total sentence of fourteen years imprisonment will provide protection to the public from further crimes. Further, Mr. Elawad's incarceration within a federal facility the offers its inmates educational programs will assist Mr. Elawad with continuing his goal of continuing his education.

Mr. Elawad is not, by any stretch of the imagination, a life long criminal. Additionally, his behavior before his arrest for the instant offense would not lead anyone to believe that he is on his way to becoming a career criminal. Thus, sentencing Mr. Elawad to more than fourteen years would amount to a sentence that is greater than necessary and thus, in violation of the reasonableness standard under 18 U.S.C.§3553(a).

**WHEREFORE,** the defendant respectfully prays that this Sentencing Position be adopted.

Respectfully submitted,

**s/Patricia Kemp**
**PATRICIA KEMP**
ASB-4592-R80K
Attorney for Malik Elawad

17

Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: patricia_kemp@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Todd A. Brown, Esquire, Assistant United States Attorney, One Court Square, Suite 201, Montgomery, Alabama 36104.

**s/Patricia Kemp**
**PATRICIA KEMP**
ASB-4592-R80K
Attorney for Malik Elawad
Federal Defenders
Middle District of Alabama
201 Monroe Street, Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: patricia_kemp@fd.org